## KINGSLEY INTERNATIONAL PICTURES CORP. *v.* REGENTS OF THE UNIVERSITY OF THE STATE OF NEW YORK.

No. 394. Argued April 23, 1959.—Decided June 29, 1959.

*Ephraim London* argued the cause for appellant. With him on the brief were *Seymour H. Chalif* and *Stephen A. Wise.*

*Charles A. Brind, Jr.* argued the cause and filed a brief for appellees.

MR. JUSTICE STEWART delivered the opinion of the Court.

Once again the Court is required to consider the impact of New York's motion picture licensing law upon First Amendment liberties, protected by the Fourteenth Amendment from infringement by the States. Cf. *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495.

The New York statute makes it unlawful "to exhibit, or to sell, lease or lend for exhibition at any place of amusement for pay or in connection with any business in the state of New York, any motion picture film or reel

[with certain exceptions not relevant here], unless there is at the time in full force and effect a valid license or permit therefor of the education department. . . ."[1] The law provides that a license shall issue "unless such film or a part thereof is obscene, indecent, immoral, inhuman, sacrilegious, or is of such a character that its exhibition would tend to corrupt morals or incite to crime. . . ."[2] A recent statutory amendment provides that, "the term 'immoral' and the phrase 'of such a character that its exhibition would tend to corrupt morals' shall denote a motion picture film or part thereof, the dominant purpose or effect of which is erotic or pornographic; or which portrays acts of sexual immorality, perversion, or lewdness, or which expressly or impliedly presents such acts as desirable, acceptable or proper patterns of behavior."[3]

As the distributor of a motion picture entitled "Lady Chatterley's Lover," the appellant Kingsley submitted that film to the Motion Picture Division of the New York Education Department for a license. Finding three isolated scenes in the film " 'immoral' within the intent of our Law," the Division refused to issue a license until the scenes in question were deleted. The distributor petitioned the Regents of the University of the State of New York for a review of that ruling.[4] The Regents upheld the denial of a license, but on the broader ground that "the whole theme of this motion picture is immoral under said law, for that theme is the presentation of adultery as a desirable, acceptable and proper pattern of behavior."

---

[1] McKinney's N. Y. Laws, 1953, Education Law, § 129.

[2] McKinney's N. Y. Laws, 1953, Education Law, § 122.

[3] McKinney's N. Y. Laws, 1953 (Cum. Supp. 1958), Education Law, § 122–a.

[4] "An applicant for a license or permit, in case his application be denied by the director of the division or by the officer authorized to issue the same, shall have the right of review by the regents." McKinney's N. Y. Laws, 1953, Education Law, § 124.

Kingsley sought judicial review of the Regents' determination.[5] The Appellate Division unanimously annulled the action of the Regents and directed that a license be issued. 4 App. Div. 2d 348, 165 N. Y. S. 2d 681. A sharply divided Court of Appeals, however, reversed the Appellate Division and upheld the Regents' refusal to license the film for exhibition. 4 N. Y. 2d 349, 151 N. E. 2d 197, 175 N. Y. S. 2d 39.[6]

The Court of Appeals unanimously and explicitly rejected any notion that the film is obscene.[7] See *Roth*

---

[5] The proceeding was brought under Art. 78 of the New York Civil Practice Act, Gilbert-Bliss' N. Y. Civ. Prac., Vol. 6B, 1944, 1949 Supp., § 1283 *et seq.* See also, McKinney's N. Y. Laws, 1953, Education Law, § 124.

[6] Although four of the seven judges of the Court of Appeals voted to reverse the order of the Appellate Division, only three of them were of the clear opinion that denial of a license was permissible under the Constitution. Chief Judge Conway wrote an opinion in which Judges Froessel and Burke concurred, concluding that denial of the license was constitutionally permissible. Judge Desmond wrote a separate concurring opinion in which he stated: "I confess doubt as to the validity of such a statute but I do not know how that doubt can be resolved unless we reverse here and let the Supreme Court have the final say." 4 N. Y. 2d, at 369, 151 N. E. 2d, at 208, 175 N. Y. S. 2d, at 55. Judge Dye, Judge Fuld, and Judge Van Voorhis wrote separate dissenting opinions.

[7] The opinion written by Chief Judge Conway stated: "[I]t is curious indeed to say in one breath, as some do, that obscene motion pictures may be censored, and then in another breath that motion pictures which alluringly portray adultery as proper and desirable may not be censored. As stated above, 'The law is concerned with effect, not merely with but one means of producing it.' It must be firmly borne in mind that to give obscenity, as defined, the stature of the only constitutional limitation is to extend an invitation to corrupt the public morals by methods of presentation which craft will insure do not fall squarely within the definition of that term. Precedent, just as sound principle, will not support a statement that motion pictures must be 'out and out' obscene before they may be

v. *United States*, 354 U. S. 476. Rather, the court found that the picture as a whole "alluringly portrays adultery as proper behavior." As Chief Judge Conway's prevailing opinion emphasized, therefore, the only portion of the statute involved in this case is that part of §§ 122 and 122–a of the Education Law requiring the denial of a license to' motion pictures "which are immoral in that they *portray* 'acts of sexual immorality . . . as desirable, acceptable or proper patterns of behavior.'" [8] 4 N. Y. 2d, at 351, 151 N. E. 2d, at 197, 175 N. Y. S. 2d, at 40. A majority of the Court of Appeals ascribed to that language a precise purpose of the New York Legislature to require the denial of a license to a motion picture "because its subject matter is adultery presented as being right and desirable for certain people under

censored." 4 N. Y. 2d, at 364, 151 N. E. 2d, at 205, 175 N. Y. S. 2d, at 51.

Judge Desmond's concurring opinion stated: "[It is not] necessarily determinative that this film is not obscene in the dictionary sense. . . ." 4 N. Y. 2d, at 369, 151 N. E. 2d, at 208, 175 N. Y. S. 2d, at 55. Judge Dye's dissenting opinion stated: "No one contends that the film in question is obscene within the narrow legal limits of obscenity as recently defined by the Supreme Court. . . ." 4 N. Y. 2d, at 371, 151 N. E. 2d, at 210, 175 N. Y. S. 2d, at 57. Judge Van Voorhis' dissenting opinion stated: "[I]t is impossible to write off this entire drama as 'mere pornography' . . . ." Judge Van Voorhis, however, would have remitted the case to the Board of Regents to consider whether certain "passages" in the film "might have been eliminated as 'obscene' without doing violence to constitutional liberties." 4 N. Y. 2d, at 375, 151 N. E. 2d, at 212, 175 N. Y. S. 2d, at 60.

[8] This is also emphasized in the brief of counsel for the Regents, which states, "The full definition is not before this Court—only these parts of the definition as cited—and any debate as to whether other parts of the definition are a proper standard has no bearing in this case."

certain circumstances." [9]  4 N. Y. 2d, at 369, 151 N. E. 2d, at 208, 175 N. Y. S. 2d, at 55 (concurring opinion).

We accept the premise that the motion picture here in question can be so characterized. We accept too, as we must, the construction of the New York Legislature's language which the Court of Appeals has put upon it. *Albertson* v. *Millard,* 345 U. S. 242; *United States* v. *Burnison,* 339 U. S. 87; *Aero Mayflower Transit Co.* v. *Board of R. R. Comm'rs,* 332 U. S. 495. That construction, we emphasize, gives to the term "sexual immorality" a concept entirely different from the concept embraced in words like "obscenity" or "pornography." [10] Moreover, it is not suggested that the film would itself operate as an incitement to illegal action. Rather, the New York Court of Appeals tells us that the relevant portion of the New York Education Law requires the denial of a license to any motion picture which approvingly portrays an adulterous relationship, quite without reference to the manner of its portrayal.

What New York has done, therefore, is to prevent the exhibition of a motion picture because that picture advocates an idea—that adultery under certain circumstances may be proper behavior. Yet the First Amendment's basic guarantee is of freedom to advocate ideas. The State, quite simply, has thus struck at the very heart of constitutionally protected liberty.

It is contended that the State's action was justified because the motion picture attractively portrays a relationship which is contrary to the moral standards, the religious precepts, and the legal code of its citizenry. This

---

[9] In concurring, Judge Desmond agreed that this was the meaning of the statutory language in question, and that "the theme and content of this film fairly deserve that characterization. . . ." 4 N. Y. 2d, at 366, 151 N. E. 2d, at 206, 175 N. Y. S. 2d, at 52.

[10] See by way of contrast, *Swearingen* v. *United States,* 161 U. S. 446; *United States* v. *Limehouse,* 285 U. S. 424.

argument misconceives what it is that the Constitution protects. Its guarantee is not confined to the expression of ideas that are conventional or shared by a majority. It protects advocacy of the opinion that adultery may sometimes be proper, no less than advocacy of socialism or the single tax. And in the realm of ideas it protects expression which is eloquent no less than that which is unconvincing.

Advocacy of conduct proscribed by law is not, as Mr. Justice Brandeis long ago pointed out, "a justification for denying free speech where the advocacy falls short of incitement and there is nothing to indicate that the advocacy would be immediately acted on." *Whitney* v. *California*, 274 U. S. 357, at 376 (concurring opinion). "Among free men, the deterrents ordinarily to be applied, to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech. . . ." *Id.*, at 378.[11]

The inflexible command which the New York Court of Appeals has attributed to the State Legislature thus cuts so close to the core of constitutional freedom as to make it quite needless in this case to examine the periphery. Specifically, there is no occasion to consider the appellant's contention that the State is entirely without power to require films of any kind to be licensed prior to their exhibition. Nor need we here determine whether, despite problems peculiar to motion pictures, the controls which a State may impose upon this medium of expression

---

[11] Thomas Jefferson wrote more than a hundred and fifty years ago, "But we have nothing to fear from the demoralizing reasonings of some, if others are left free to demonstrate their errors. And especially when the law stands ready to punish the first criminal *act* produced by the false reasoning. These are safer correctives than the conscience of a judge." Letter of Thomas Jefferson to Elijah Boardman, July 3, 1801, Jefferson Papers, Library of Congress, Vol. 115, folio 19761.

are precisely coextensive with those allowable for newspapers,[12] books,[13] or individual speech.[14]  It is enough for the present case to reaffirm that motion pictures are within the First and Fourteenth Amendments' basic protection.  *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495.

*Reversed.*

MR. JUSTICE BLACK, concurring.

I concur in the Court's opinion and judgment but add a few words because of concurring opinions by several Justices who rely on their appraisal of the movie Lady Chatterley's Lover for holding that New York cannot constitutionally bar it.  Unlike them, I have not seen the picture.  My view is that stated by MR. JUSTICE DOUGLAS, that prior censorship of moving pictures like prior censorship of newspapers and books violates the First and Fourteenth Amendments.  If despite the Constitution, however, this Nation is to embark on the dangerous road of censorship, my belief is that this Court is about the most inappropriate Supreme Board of Censors that could be found.  So far as I know, judges possess no special expertise providing exceptional competency to set standards and to supervise the private morals of the Nation.  In addition, the Justices of this Court seem especially unsuited to make the kind of value judgments—as to what movies are good or bad for local communities— which the concurring opinions appear to require.  We are told that the only way we can decide whether a State or municipality can constitutionally bar movies is for this Court to view and appraise each movie on a case-by-case basis.  Under these circumstances, every member of the

---

[12] Cf. *Near* v. *Minnesota,* 283 U. S. 697.

[13] Cf. *Kingsley Books, Inc.* v. *Brown,* 354 U. S. 436; *Alberts* v. *California,* 354 U. S. 476.

[14] Cf. *Thomas* v. *Collins,* 323 U. S. 516; *Thornhill* v. *Alabama,* 310 U. S. 88.

Court must exercise his own judgment as to how bad a picture is, a judgment which is ultimately based at least in large part on his own standard of what is immoral. The end result of such decisions seems to me to be a purely personal determination by individual Justices as to whether a particular picture viewed is too bad to allow it to be seen by the public. Such an individualized determination cannot be guided by reasonably fixed and certain standards. Accordingly, neither States nor moving picture makers can possibly know in advance, with any fair degree of certainty, what can or cannot be done in the field of movie making and exhibiting. This uncertainty cannot easily be reconciled with the rule of law which our Constitution envisages.

The different standards which different people may use to decide about the badness of pictures are well illustrated by the contrasting standards mentioned in the opinion of the New York Court of Appeals and the concurring opinion of MR. JUSTICE FRANKFURTER here. As I read the New York court's opinion this movie was held immoral and banned because it makes adultery too alluring. MR. JUSTICE FRANKFURTER quotes Mr. Lawrence, author of the book from which the movie was made, as believing censorship should be applied only to publications that make sex look ugly, that is, as I understand it, less alluring.

In my judgment, this Court should not permit itself to get into the very center of such policy controversies, which have so little in common with lawsuits.

MR. JUSTICE FRANKFURTER, concurring in the result.

As one whose taste in art and literature hardly qualifies him for the *avant-garde,* I am more than surprised, after viewing the picture, that the New York authorities should have banned "Lady Chatterley's Lover." To assume that this motion picture would have offended Victorian

moral sensibilities is to rely only on the stuffiest of Victorian conventions. Whatever one's personal preferences may be about such matters, the refusal to license the exhibition of this picture, on the basis of the 1954 amendment to the New York State Education Law, can only mean that that enactment forbids the public showing of any film that deals with adultery except by way of sermonizing condemnation or depicts any physical manifestation of an illicit amorous relation. Since the denial of a license by the Board of Regents was confirmed by the highest court of the State, I have no choice but to agree with this Court's judgment in holding that the State exceeded the bounds of free expression protected by the "liberty" of the Fourteenth Amendment. But I also believe that the Court's opinion takes ground that exceeds the appropriate limits for decision. By way of reinforcing my brother HARLAN's objections to the scope of the Court's opinion, I add the following.

Even the author of "Lady Chatterley's Lover" did not altogether rule out censorship, nor was his passionate zeal on behalf of society's profound interest in the endeavors of true artists so doctrinaire as to be unmindful of the facts of life regarding the sordid exploitation of man's nature and impulses. He knew there was such a thing as pornography, dirt for dirt's sake, or, to be more accurate, dirt for money's sake. This is what D. H. Lawrence wrote:

> "But even I would censor genuine pornography, rigorously. It would not be very difficult. In the first place, genuine pornography is almost always underworld, it doesn't come into the open. In the second, you can recognize it by the insult it offers invariably, to sex, and to the human spirit.

> "Pornography is the attempt to insult sex, to do dirt on it. This is unpardonable. Take the very lowest instance, the picture post-card sold underhand,

by the underworld, in most cities. What I have seen of them have been of an ugliness to make you cry. The insult to the human body, the insult to a vital human relationship! Ugly and cheap they make the human nudity, ugly and degraded they make the sexual act, trivial and cheap and nasty." (D. H. Lawrence, Pornography and Obscenity, pp. 12–13.)

This traffic has not lessened since Lawrence wrote. Apparently it is on the increase. In the course of the recent debate in both Houses of Parliament on the Obscene Publications Bill, now on its way to passage, designed to free British authors from the hazards of too rigorous application in our day of Lord Cockburn's ruling, in 1868, in *Regina v. Hicklin*, L. R. 3 Q. B. 360, weighty experience was adduced regarding the extensive dissemination of pornographic materials.[1] See 597 Parliamentary Debates, H. C., No. 36 (Tuesday, December 16, 1958), cols. 992 *et seq.*, and 216 Parliamentary Debates H. L., No. 77 (Tuesday, June 2, 1959), cols. 489 *et seq.* Nor is there any reason to believe that on this side of the ocean there has been a diminution in the pornographic business which years ago sought a flourishing market in some of the leading secondary schools for boys, who presumably had more means than boys in the public high schools.

It is not surprising, therefore, that the pertinacious, eloquent and free-spirited promoters of the liberalizing legislation in Great Britain did not conceive the needs of a civilized society, in assuring the utmost freedom to those who make literature and art possible—authors, artists, publishers, producers, book sellers—easily attainable by sounding abstract and unqualified dogmas about freedom.

---

[1] "In the course of our enquiries, we have been impressed with the existence of a considerable and lucrative trade in pornography . . . ." Report of the Select Committee on Obscene Publications to the House of Commons, March 20, 1958, p. IV.

They had a keen awareness that freedom of expression is no more an absolute than any other freedom, an awareness that is reflected in the opinions of Mr. Justice Holmes and Mr. Justice Brandeis, to whom we predominantly owe the present constitutional safeguards on behalf of freedom of expression. And see *Near* v. *Minnesota,* 283 U. S. 697, 715–716, for limitations on constitutionally protected freedom of speech.[2]

In short, there is an evil against which a State may constitutionally protect itself, whatever we may think about the questions of policy involved. The real problem is the formulation of constitutionally allowable safeguards which society may take against evil without impinging upon the necessary dependence of a free society upon the fullest scope of free expression. One cannot read the debates in the House of Commons and the House of Lords and not realize the difficulty of reconciling these conflicting interests, in the framing of legislation on the ends of which there was agreement, even for those who most generously espouse that freedom of expression without which all freedom gradually withers.

It is not our province to meet these recalcitrant problems of legislative drafting. Ours is the vital but very limited task of scrutinizing the work of the draftsmen in order to determine whether they have kept within the narrow limits of the kind of censorship which even D. H. Lawrence deemed necessary. The legislation must not be so vague, the language so loose, as to leave to those who have to apply it too wide a discretion for sweeping within its condemnation what is permissible expression as

---

[2] "The objection has also been made that the principle as to immunity from previous restraint is stated too broadly, if every such restraint is deemed to be prohibited. That is undoubtedly true; the protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases . . . ." 283 U. S., at 715–716.

well as what society may permissibly prohibit. Always remembering that the widest scope of freedom is to be given to the adventurous and imaginative exercise of the human spirit, we have struck down legislation phrased in language intrinsically vague, unless it be responsive to the common understanding of men even though not susceptible of explicit definition. The ultimate reason for invalidating such laws is that they lead to timidity and inertia and thereby discourage the boldness of expression indispensable for a progressive society.

The New York legislation of 1954 was the product of careful lawyers who sought to meet decisions of this Court which had left no doubt that a motion-picture licensing law is not inherently outside the scope of the regulatory powers of a State under the Fourteenth Amendment. The Court does not strike the law down because of vagueness, as we struck down prior New York legislation. Nor does it reverse the judgment of the New York Court of Appeals, as I would, because in applying the New York law to "Lady Chatterley's Lover" it applied it to a picture to which it cannot be applied without invading the area of constitutionally free expression. The difficulty which the Court finds seems to derive from some expressions culled here and there from the opinion of the Chief Judge of the New York Court of Appeals. This leads the Court to give the phrase "acts of sexual immorality . . as desirable, acceptable or proper patterns of behavior" an innocent content, meaning, in effect, an allowable subject matter for discussion. But, surely, to attribute that result to the decision of the Court of Appeals, on the basis of a few detached phrases of Chief Judge Conway, is to break a faggot into pieces, is to forget that the meaning of language is to be felt and its phrases not to be treated disjointedly. "Sexual immorality" is not a new phrase in this branch of law and its implications dominate the

context. I hardly conceive it possible that the Court would strike down as unconstitutional the federal statute against mailing lewd, obscene and lascivious matter, which has been the law of the land for nearly a hundred years, see the Act of March 3, 1865, 13 Stat. 507, and March 3, 1873, 17 Stat. 599, whatever specific instances may be found not within its allowable prohibition. In sustaining this legislation this Court gave the words "lewd, obscene and lascivious" concreteness by saying that they concern "sexual immorality." And only very recently the Court sustained the constitutionality of the statute. *Roth* v. *United States,* 354 U. S. 476.

Unless I misread the opinion of the Court, it strikes down the New York legislation in order to escape the task of deciding whether a particular picture is entitled to the protection of expression under the Fourteenth Amendment. Such an exercise of the judicial function, however onerous or ungrateful, inheres in the very nature of the judicial enforcement of the Due Process Clause. We cannot escape such instance-by-instance, case-by-case application of that clause in all the varieties of situations that come before this Court. It would be comfortable if, by a comprehensive formula, we could decide when a confession is coerced so as to vitiate a state conviction. There is no such talismanic formula. Every Term we have to examine the particular circumstances of a particular case in order to apply generalities which no one disputes. It would be equally comfortable if a general formula could determine the unfairness of a state trial for want of counsel. But, except in capital cases, we have to thread our way, Term after Term, through the particular circumstances of a particular case in relation to a particular defendant in order to ascertain whether due process was denied in the unique situation before us. We are constantly called upon to consider the alleged misconduct of a prosecutor as vitiating the fairness of a partic-

ular trial or the inflamed state of public opinion in a particular case as undermining the constitutional right to due process. Again, in the series of cases coming here from the state courts, in which due process was invoked to enforce separation of church and state, decision certainly turned on the particularities of the specific situations before the Court. It is needless to multiply instances. It is the nature of the concept of due process, and, I venture to believe, its high serviceability in our constitutional system, that the judicial enforcement of the Due Process Clause is the very antithesis of a Procrustean rule. This was recognized in the first full-dress discussion of the Due Process Clause of the Fourteenth Amendment, when the Court defined the nature of the problem as a "gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require, with the reasons on which such decision may be founded." *Davidson* v. *New Orleans,* 96 U. S. 97, 104. The task is onerous and exacting, demanding as it does the utmost discipline in objectivity, the severest control of personal predilections. But it cannot be escaped, not even by disavowing that such is the nature of our task.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK joins, concurring.

While I join in the opinion of the Court, I adhere to the views I expressed in *Superior Films* v. *Department of Education,* 346 U. S. 587, 588–589, that censorship of movies is unconstitutional, since it is a form of "previous restraint" that is as much at war with the First Amendment, made applicable to the States through the Fourteenth, as the censorship struck down in *Near* v. *Minnesota,* 283 U. S. 697. If a particular movie violates a valid law, the exhibitor can be prosecuted in the usual way. I can find in the First Amendment no room for any censor

whether he is scanning an editorial, reading a news broadcast, editing a novel or a play, or previewing a movie.

Reference is made to British law and British practice. But they have little relevance to our problem, since we live under a written Constitution. What is entrusted to the keeping of the legislature in England is protected from legislative interference or regulation here. As we stated in *Bridges* v. *California*, 314 U. S. 252, 265, "No purpose in ratifying the Bill of Rights was clearer than that of securing for the people of the United States much greater freedom of religion, expression, assembly, and petition than the people of Great Britain had ever enjoyed." If we had a provision in our Constitution for "reasonable" regulation of the press such as India has included in hers,[1] there would be room for argument that censorship in the interests of morality would be permissible. Judges sometimes try to read the word "reasonable" into the First Amendment or make the rights it grants subject to reasonable regulation (see *Beauharnais* v. *Illinois*, 343 U. S. 250, 262; *Dennis* v. *United States*, 341 U. S. 494, 523–525), or apply to the States a watered-down version of the First Amendment. See *Roth* v. *United States*, 354 U. S. 476, 505–506. But its language, in terms that are absolute, is utterly at war with censorship. Different questions may arise as to censorship of some news when the Nation is actually at war. But any possible exceptions are extremely limited. That is why the tradition represented by *Near* v. *Minnesota, supra,* represents our constitutional ideal.

---

[1] Section 19 (2) of the Indian Constitution permits "reasonable restrictions" on the exercise of the right of freedom of speech and expression in the interests, *inter alia*, of "decency or morality . . . defamation or incitement to an offence." This limitation is strictly construed; any restriction amounting to an "imposition" which will "operate harshly" on speech or the press will be held invalid. See *Seshadri* v. *District Magistrate, Tangore*, 41 A. I. R. (Sup. Ct.) 747, 749.

Happily government censorship has put down few roots in this country. The American tradition is represented by *Near* v. *Minnesota, supra*. See Lockhart and McClure, Literature, The Law of Obscenity, and the Constitution, 38 Minn. L. Rev. 295, 324–325; Alpert, Judicial Censorship of Obscene Literature, 52 Harv. L. Rev. 40, 53 *et seq.* We have in the United States no counterpart of the Lord Chamberlain who is censor over England's stage. As late as 1941 only six States had systems of censorship for movies. Chafee, Free Speech in the United States (1941), p. 540. That number has now been reduced to four [2]—Kansas, Maryland, New York, and Virginia—plus a few cities. Even in these areas, censorship of movies shown on television gives way by reason of the Federal Communications Act. See *Allen B. Dumont Laboratories* v. *Carroll*, 184 F. 2d 153. And from what information is available, movie censors do not seem to be very active.[3] Deletion of the residual part of censorship that remains would constitute the elimination of an institution that intrudes on First Amendment rights.

Mr. Justice Clark, concurring in the result.

I can take the words of the majority of the New York Court of Appeals only in their clear, unsophisticated and common meaning. They say that §§ 122 and 122–a of New York's Education Law "require the denial of a license to motion pictures which are immoral in that they portray 'acts of sexual immorality . . . as desirable, acceptable or proper patterns of behavior.'" That court states the issue in the case in this language:

"Moving pictures are our only concern and, what is more to the point, only those motion pictures which

[2] See Note, 71 Harv. L. Rev. 326, 328, n. 14.

[3] *Id.*, p. 332.

alluringly present acts of sexual immorality as proper behavior." 4 N. Y. 2d 349, 361, 151 N. E. 2d 197, 203, 175 N. Y. S. 2d 39, 48.

Moreover, it is significant to note that in its 14-page opinion that court says again and again, in fact 15 times, that the picture "Lady Chatterley's Lover" is proscribed because of its "espousal" of sexual immorality as "desirable" or as "proper conduct for the people of our State."*

The minority of my brothers here, however, twist this holding into one that New York's Act requires "obscenity or incitement, not just abstract expressions of opinion." But I cannot so obliterate the repeated declarations above-mentioned that were made not only 15 times by the Court of Appeals but which were the basis of the Board of Regents' decision as well. Such a construction would raise many problems, not the least of which would be our failure to accept New York's interpretation of the scope of its own Act. I feel, as does the majority here, bound by their holding.

In this context, the Act comes within the ban of *Joseph Burstyn, Inc.,* v. *Wilson,* 343 U. S. 495 (1952). We held there that "expression by means of motion pic-

---

*The phrase is not always identical but varies from the words of the statute, "acts of sexual immorality . . . as desirable, acceptable or proper patterns of behavior," to such terms "as proper conduct for the people of our State"; "exaltation of illicit sexual love in derogation of the restraints of marriage"; as "a proper pattern of behavior"; "the espousal of sexually immoral acts"; "which debase fundamental sexual morality by portraying its converse to the people as alluring and desirable"; "which alluringly portrays sexually immoral acts as proper behavior"; "by presenting . . . [adultery] in a clearly approbatory manner"; "which alluringly portrays adultery as proper behavior"; "which alluringly portray acts of sexual immorality (here adultery) and recommend them as a proper way of life"; "which alluringly portray adultery as proper and desirable"; and "which alluringly portray acts of sexual immorality by adultery as proper behavior."

tures is included within the free speech and free press guaranty of the First and Fourteenth Amendments." *Id.,* at 502. Referring to *Near* v. *Minnesota,* 283 U. S. 697 (1931), we said that while "a major purpose of the First Amendment guaranty of a free press was to prevent prior restraints upon publication" such protection was not unlimited but did place on the State "a heavy burden to demonstrate that the limitation challenged" was exceptional. *Id.,* at 503–504. The standard applied there was the word "sacrilegious" and we found it set the censor "adrift upon a boundless sea amid a myriad of conflicting currents of religious views . . . ." *Id.,* at 504. We struck it down.

Here the standard is the portrayal of "acts of sexual immorality . . . as desirable, acceptable or proper patterns of behavior." Motion picture plays invariably have a hero, a villain, supporting characters, a location, a plot, a diversion from the main theme and usually a moral. As we said in *Burstyn:* "They may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression." 343 U. S., at 501. What may be to one viewer the glorification of an idea as being "desirable, acceptable or proper" may to the notions of another be entirely devoid of such a teaching. The only limits on the censor's discretion is his understanding of what is included within the term "desirable, acceptable or proper." This is nothing less than a roving commission in which individual impressions become the yardstick of action, and result in regulation in accordance with the beliefs of the individual censor rather than regulation by law. Even here three of my brothers "cannot regard this film as depicting anything more than a somewhat unusual, and rather pathetic, 'love triangle.'" At least three—perhaps four—of the members of New York's highest court thought otherwise. I

need only say that the obscurity of the standard presents such a choice of difficulties that even the most experienced find themselves at dagger's point.

It may be, as Chief Judge Conway said, "that our public morality, possibly more than ever before, needs every protection government can give." 4 N. Y. 2d, at 363, 151 N. E. 2d, at 204–205, 175 N. Y. S. 2d, at 50. And, as my Brother HARLAN points out, "each time such a statute is struck down, the State is left in more confusion." This is true where broad grounds are employed leaving no indication as to what may be necessary to meet the requirements of due process. I see no grounds for confusion, however, were a statute to ban "pornographic" films, or those that "portray *acts* of sexual immorality, perversion or lewdness." If New York's statute had been so construed by its highest court I believe it would have met the requirements of due process. Instead, it placed more emphasis on what the film teaches than on what it depicts. There is where the confusion enters. For this reason, I would reverse on the authority of *Burstyn*.

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANKFURTER and MR. JUSTICE WHITTAKER join, concurring in the result.

I think the Court has moved too swiftly in striking down a statute which is the product of a deliberate and conscientious effort on the part of New York to meet constitutional objections raised by this Court's decisions respecting predecessor statutes in this field. But although I disagree with the Court that the parts of §§ 122 and 122–a of the New York Education Law, 16 N. Y. Laws Ann. § 122 (McKinney 1953), 16 N. Y. Laws Ann. § 122–a (McKinney Supp. 1958), here particularly involved are unconstitutional on their face, I believe that in their application to this film constitutional bounds were exceeded.

## I.

Section 122–a of the State Education Law was passed in 1954 to meet this Court's decision in *Commercial Pictures Corp.* v. *Regents,* 346 U. S. 587, which overturned the New York Court of Appeals' holding in *In re Commercial Pictures Corp.* v. *Board of Regents,* 305 N. Y. 336, 113 N. E. 2d 502, that the film *La Ronde* could be banned as "immoral" and as "tend[ing] to corrupt morals" under § 122.[1] The Court's decision in *Commercial Pictures* was but a one line *per curiam* with a citation to *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, which in turn had held for naught not the word "immoral" but the term "sacrilegious" in the statute.

New York, nevertheless, set about repairing its statute. This it did by enacting § 122–a which in the respects emphasized in the present opinion of Chief Judge Conway as pertinent here defines an "immoral" motion picture film as one which portrays " 'acts of sexual immorality . . . as desirable, acceptable or proper patterns of behavior.' " 4 N. Y. 2d 349, 351, 151 N. E. 2d 197, 175 N. Y. S. 2d 39.[2] The Court now holds this part of New York's effort

---

[1] Section 122 provides: "The director of the [motion picture] division or, when authorized by the regents, the officers of a local office or bureau shall cause to be promptly examined every motion picture film submitted to them as herein required, and unless such film or a part thereof is obscene, indecent, immoral, inhuman, sacrilegious, or is of such a character that its exhibition would tend to corrupt morals or incite to crime, shall issue a license therefor. If such director or, when so authorized, such officer shall not license any film submitted, he shall furnish to the applicant therefor a written report of the reasons for his refusal and a description of each rejected part of a film not rejected in toto."

[2] Section 122–a provides:

"1. For the purpose of section one hundred twenty-two of this chapter, the term 'immoral' and the phrase 'of such a character that its exhibition would tend to corrupt morals' shall denote a motion

unconstitutional on its face under the Fourteenth Amendment. I cannot agree.

The Court does not suggest that these provisions are bad for vagueness.[3] Any such suggestion appears

---

picture film or part thereof, the dominant purpose or effect of which is erotic or pornographic; or which portrays acts of sexual immorality, perversion, or lewdness, or which expressly or impliedly presents such acts as desirable, acceptable or proper patterns of behavior.

"2. For the purpose of section one hundred twenty-two of this chapter, the term 'incite to crime' shall denote a motion picture the dominant purpose or effect of which is to suggest that the commission of criminal acts or contempt for law is profitable, desirable, acceptable, or respectable behavior; or which advocates or teaches the use of, or the methods of use of, narcotics or habit-forming drugs."

[3] The bill that became § 122–a was introduced at the request of the State Education Department, which noted in a memorandum that "the issue of censorship, as such, is not involved in this bill. This bill merely attempts to follow out the criticism of the United States Supreme Court by defining the words 'immoral' and 'incite to crime.'" N. Y. S. Legis. Ann., 1954, 36. In a memorandum accompanying his approval of the measure, the then Governor of New York, himself a lawyer, wrote:

"Since 1921, the Education Law of this State has required the licensing of motion pictures and authorized refusal of a license for a motion picture which is 'obscene, indecent, immoral' or which would 'tend to corrupt morals or incite to crime.'

"Recent Supreme Court decisions have indicated that the term 'immoral' may not be sufficiently definite for constitutional purposes. The primary purpose of this bill is to define 'immoral' and 'tend to corrupt morals' in conformance with the apparent requirements of these cases. It does so by defining them in terms of 'sexual immorality.' The words selected for this definition are based on judicial opinions which have given exhaustive and reasoned treatment to the subject.

"The bill does not create any new licensing system, expand the scope of motion picture censorship, or enlarge the area of permissible prior restraint. Its sole purpose is to give to the section more precision to make it conform to the tenor of recent court decisions and proscribe the exploitation of 'filth for the sake of filth.' It does so

to me untenable in view of the long-standing usage in this Court of the concept "sexual immorality" to explain in part the meaning of "obscenity." See, *e. g.*, *Swearingen* v. *United States,* 161 U. S. 446,.451.[4] Instead, the Court finds a constitutional vice in these provisions in that they require, so.it is said, neither "obscenity" nor incitement to "sexual immorality," but strike of their own force at the mere advocacy of "an idea—that adultery under certain circumstances may be proper behavior"; expressions of "opinion that adultery may sometimes be proper . . . ." I think this characterization of these provisions misconceives the construction put upon them by the prevailing opinions in the Court of Appeals. Granting that the abstract public discussion or advocacy of adultery, unaccompanied by obscene portrayal or actual incitement to such behavior, may not constitutionally be proscribed by the State, I do not read those opinions to hold that the statute on its face undertakes

---

as accurately as language permits in 'words well understood through long use.' [*People* v. *Winters,* 333 U. S. 507, 518 (1948)].

.      .      .      .      .

"The language of the Supreme Court of the United States, in a recent opinion of this precise problem, should be noted:

" 'To hold that liberty and expression by means of motion pictures is guaranteed by the First and Fourteenth Amendments, however, is not the end of our problem. It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places.' [*Burstyn* v. *Wilson,* 343 U. S. 495, at 502].

"So long as the State has the responsibility for interdicting motion pictures which transgress the bounds of decency, we have the responsibility for. furnishing guide lines to the agency charged with enforcing the law." *Id.,* at 408.

[4] Certainly it cannot be claimed that adultery is not a form of "sexual immorality"; indeed adultery is made a crime in New York. N. Y. Penal Law §§ 100–103, 39 N. Y. Laws Ann. §§ 100–103 (McKinney 1944).

any ,such proscription. Chief Judge Conway's opinion, which was joined by two others of the seven judges of the Court of Appeals, and in the thrust of which one more concurred, to be sure with some doubt, states (4 N. Y. 2d, at 356, 151 N. E. 2d, at 200, 175 N. Y. S. 2d, at 44):

> "It should first be emphasized that the scope of section 122-a is not mere expression of opinion in the form, for example, of a filmed lecture whose subject matter is the espousal of adultery. We reiterate that this case involves the espousal of sexually immoral acts (here adultery) *plus* actual scenes of a suggestive and obscene nature." (Emphasis in original.)

The opinion elsewhere, as indeed is also the case with §§ 122 and 122-a themselves when independently read in their entirety, is instinct with the notion that mere abstract expressions of opinion regarding the desirability of sexual immorality, unaccompanied by obscenity [5] or incitement, are not proscribed. See 4 N. Y. 2d 349, especially at 351–352, 354, 356–358, 361, 363–364; 151 N. E. 2d 197, at 197, 199, 200–201, 203, 204–205; 175 N. Y. S. 2d 39, at 40, 42, 44–46, 48, 50–51; and Notes 1 and 2, *supra.* It is the corruption of public morals, occasioned by the inciting effect of a particular portrayal or by what New York has deemed the necessary effect of obscenity, at which the statute is aimed. In the words of Chief Judge Conway, "There is no differ-

---

[5] Nothing in Judge Dye's dissenting opinion, to which the Court refers in Note 7 of its opinion, can be taken as militating against this view of the prevailing opinions in the Court of Appeals. Judge Dye simply disagreed with the majority of the Court of Appeals as to the adequacy of the § 122-a definition of "immoral" to overcome prior constitutional objections to that term. See 4 N. Y. 2d, at 371, 151 N. E. 2d, at 209–210, 175 N. Y. S. 2d, at 57; see also the dissenting opinion of Judge Van Voorhis, 4 N. Y. 2d, at 374, 151 N. E. 2d, at 212, 175 N. Y. S. 2d, at 60.

ence in substance between motion pictures which are corruptive of the public morals, and sexually suggestive, because of a predominance of suggestive scenes, and those which achieve precisely the same effect by presenting only several such scenes in a clearly approbatory manner throughout the course of the film. *The law is concerned with effect, not merely with but one means of producing it . . . the objection lies in the corrosive effect upon the public sense of sexual morality.*" 4 N. Y. 2d, at 358, 151 N. E. 2d, at 201, 175 N. Y. S. 2d, at 46. (Emphasis in original.)

I do not understand that the Court would question the constitutionality of the particular portions of the statute with which we are here concerned if the Court read, as I do, the majority opinions in the Court of Appeals as construing these provisions to require obscenity or incitement, not just mere abstract expressions of opinion. It is difficult to understand why the Court should strain to read those opinions as it has. Our usual course in constitutional adjudication is precisely the opposite.

## II.

The application of the statute to this film is quite a different matter. I have heretofore ventured the view that in this field the States have wider constitutional latitude than the Federal Government. See the writer's separate opinion in *Roth* v. *United States* and *Alberts* v. *California,* 354 U. S. 476, 496. With that approach, I have viewed this film.

Giving descriptive expression to what in matters of this kind are in the last analysis bound to be but individual subjective impressions, objectively as one may try to discharge his duty as a judge, is not apt to be repaying. I shall therefore content myself with saying that, according full respect to, and with, I hope, sympathetic consideration for, the views and characterizations expressed by

others, I cannot regard this film as depicting anything more than a somewhat unusual, and rather pathetic, "love triangle," lacking in anything that could properly be termed obscene or corruptive of the public morals by inciting the commission of adultery. I therefore think that in banning this film New York has exceeded constitutional limits.

I conclude with one further observation. It is sometimes said that this Court should shun considering the particularities of individual cases in this difficult field lest the Court become a final "board of censorship." But I cannot understand why it should be thought that the process of constitutional judgment in this realm somehow stands apart from that involved in other fields, particularly those presenting questions of due process. Nor can I see, short of holding that all state "censorship" laws are constitutionally impermissible, a course from which the Court is carefully abstaining, how the Court can hope ultimately to spare itself the necessity for individualized adjudication. In the very nature of things the problems in this area are ones of individual cases, see *Roth* v. *United States* and *Alberts* v. *California, supra,* at 496–498, for a "censorship" statute can hardly be contrived that would in effect be self-executing. And, lastly, each time such a statute is struck down, the State is left in more confusion, as witness New York's experience with its statute.

Because I believe the New York statute was unconstitutionally applied in this instance I concur in the judgment of the Court.