[Civ. No. 46981. First Dist., Div. Four. Dec. 7, 1981.]

OLIVIA N., a Minor, etc., Plaintiff and Appellant, v.
NATIONAL BROADCASTING COMPANY, INC., et al.,
Defendants and Respondents.

COUNSEL

Lewis, Rouda & Lewis, Marvin E. Lewis, Victoria J. De Goff and De Goff & Sherman for Plaintiff and Appellant.

James J. Brosnahan, Linda E. Shostak, Morrison & Foerster, Floyd Abrams, Dean Ringel, Patricia A. McGovern and Cahill, Gordon & Reindel, for Defendants and Respondents.

Hassard, Bonnington, Rogers & Huber, Howard Hassard, David E. Willett, Nancy Hudgins, Wylie Aitken, Robert E. Cartwright, Edward I. Pollock, Glen T. Bashore, Stephen I. Zetterberg, J. Nick DeMeo, Sanford M. Gage, Stephen L. Odgers, Harry R. Levine, Leonard Sacks and Joseph Posner as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**CHRISTIAN, J.**—Olivia N. appeals from a judgment of nonsuit terminating her action against the National Broadcasting Company and the Chronicle Broadcasting Company. Appellant sought damages for physical and emotional injury inflicted by assailants who had seen a television broadcast of a film drama.

A defense motion for summary judgment was denied, and the case was set for trial by jury. Before impanelment of a jury the trial court viewed the film and determined for itself that the film did not serve to incite violent and depraved conduct such as the crimes committed against the plaintiff and on that basis rendered judgment for defendants.

On appeal from the judgment this court recognized that certain narrowly limited classes of speech may be prevented or punished by the state consistent with the principles of the First Amendment and held that "the trial court's action in viewing the film, and thereupon making fact findings and rendering judgment for respondents, was a violation of appellant's constitutional right to trial by jury." (*Olivia N.* v. *National Broadcasting Co.* (1977) 74 Cal.App.3d 383, 389 [141 Cal.Rptr. 511].) Therefore, the judgment was reversed with directions to impanel a jury and proceed to trial of the action.

On remand, appellant's counsel in his opening statement to the jury indicated that the evidence would establish negligence and recklessness on respondents' part, rather than incitement.[1] At the conclusion of appellant's opening statement, respondents moved for a judgment of nonsuit (Code Civ. Proc., § 581c, subd. (a)) on the grounds that appellant admittedly could not meet the test for incitement. (*Brandenburg* v. *Ohio* (1969) 395 U.S. 444, 447 [23 L.Ed.2d 430, 433, 89 S.Ct. 1827].) Appellant's counsel again acknowledged his inability to meet the incitement test; the trial court granted respondents' motion and rendered judgment dismissing the action. Plaintiff again appealed.

■ A trial court may grant a defendant's motion for nonsuit only if the plaintiff's evidence would not support a jury verdict in plaintiff's favor. (*Ewing* v. *Cloverleaf Bowl* (1978) 20 Cal.3d 389, 395 [143 Cal. Rptr. 13, 572 P.2d 1155]; see *Pike* v. *Frank G. Hough Co.* (1970) 2 Cal.3d 465, 469 [85 Cal.Rptr. 629, 467 P.2d 229].) ■ Where a nonsuit is granted on the opening statement, factual recitals in the opening statement must be accepted as true. (See *Willis* v. *Gordon* (1978) 20 Cal.3d 629, 633-634 [143 Cal.Rptr. 723, 574 P.2d 794].)

At 8 p.m. on September 10, 1974, NBC telecast nationwide, and Chronicle Broadcasting Company broadcast locally, a film entitled "Born Innocent." "The subject matter of the television film was the harmful effect of a state-run home upon an adolescent girl who had become a ward of the state. In one scene of the film, the young girl enters the community bathroom of the facility to take a shower. She is then shown taking off her clothes and stepping into the shower, where she bathes for a few moments. Suddenly, the water stops and a look of fear comes across her face. Four adolescent girls are standing across from her in the shower room. One of the girls is carrying a 'plumber's helper,' waving it suggestively by her side. The four girls violently attack the younger girl, wrestling her to the floor. The young girl is shown naked from the waist up, struggling as the older girls force her legs

---

[1] Appellant's counsel stated that: "The plaintiffs in this case at no time in this trial are going to prove what is known as 'incitement.'

"At no time in this trial are we going to prove that either through negligence or recklessness there was incitement, which incitement is telling someone to go out encouraging them, directing them, advising them; that there will be no evidence that NBC ever told anybody or incited anyone to go out and rape a girl with an articifical instrument or in any other way.

"So at all times during this trial, I want you to have in mind, ladies and gentlemen, that all of our proof will not be based on any type of incitement, but will be based on stimulation, foreseeability, negligence, proximate cause."

apart. Then, the television film shows the girl with the plumber's helper making intense thrusting motions with the handle of the plunger until one of the four says, 'That's enough.' The young girl is left sobbing and naked on the floor." (*Olivia N.* v. *National Broadcasting Co., supra,* 74 Cal.App.3d 383, 386.) It is alleged that on September 14, 1974, appellant, aged 9, was attacked and forcibly "artifically raped" with a bottle by minors at a San Francisco beach. (*Id.,* at pp. 386-387.) The assailants had viewed and discussed the "artificial rape" scene in "Born Innocent," and the film allegedly caused the assailants to decide to commit a similar act on appellant. Appellant offered to show that NBC had knowledge of studies on child violence and should have known that susceptible persons might imitate the crime enacted in the film. Appellant alleged that "Born Innocent" was particularly likely to cause imitation and that NBC televised the film without proper warning in an effort to obtain the largest possible viewing audience. Appellant alleged that as a proximate result of respondents' telecast, she suffered physical and psychological damage.

Appellant contends that where there is negligence liability could constitutionally be imposed despite the absence of proof of incitement as defined in *Brandenburg* v. *Ohio, supra,* 395 U.S. 444, 447. Appellant argues in the alternative that a different definition of "incitement" should be applied to the present circumstances.

■ "Analysis of this appeal commences with recognition of the overriding constitutional principle that material communicated by the public media, including fictional material such as the television drama here at issue, is generally to be accorded protection under the First Amendment to the Constitution of the United States. (*Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495, 501 []; *Winters* v. *New York* (1948) 333 U.S. 507, 510 [].)" (*Olivia N.* v. *National Broadcasting Co., supra,* 74 Cal.App.3d 383, 387.) First Amendment rights are accorded a preferred place in our democratic society. (*Thomas* v. *Collins* (1945) 323 U.S. 516, 530 [89 L.Ed. 430, 440, 65 S.Ct. 315].) First Amendment protection extends to a communication, to its source and to its recipients. (*Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 756 [48 L.Ed.2d 346, 354, 96 S.Ct. 1817].) "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." (*Police Department of Chicago* v. *Mosley* (1972) 408 U.S. 92, 95 [33 L.Ed.2d 212, 216, 92 S.Ct. 2286]; see *Consolidated Edison* v. *Public Serv. Comm'n* (1980) 447 U.S. 530, 538-539 [65 L.Ed.2d

319, 328-329, 100 S.Ct. 2326]; *Carey* v. *Brown* (1980) 447 U.S. 455, 462-463 [65 L.Ed.2d 263, 270-271, 100 S.Ct. 2286]; *Cohen* v. *California* (1971) 403 U.S. 15, 24 [29 L.Ed.2d 284, 293, 91 S.Ct. 1780]; *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 269-270 [11 L.Ed.2d 686, 700-701, 84 S.Ct. 710, 95 A.L.R.2d 1412].) Applied to the electronic media, the First Amendment means that it is the broadcaster that has authority to make programming decisions. (*Writers Guild of America, West, Inc.* v. *F. C. C.* (C.D.Cal. 1976) 423 F.Supp. 1064, 1154.)

Motion pictures are accorded First Amendment protections. (*Joseph Burstyn, Inc.* v. *Wilson, supra,* 343 U.S. 495, 501 [96 L.Ed. 1098, 1105, 72 S.Ct. 777].) "[T]he central concern of the First Amendment in this area is that there be a free flow from creator to audience of whatever message a film or a book might convey.... [T]he central First Amendment concern remains the need to maintain free access of the public to the expression." (*Young* v. *American Mini Theatres* (1976) 427 U.S. 50, 77 [49 L.Ed.2d 310, 330, 96 S.Ct. 2440] [conc. opn. of Powell, J.]) Freedom of speech is not limited to political expression or comment on public affairs. (*Time, Inc.* v. *Hill* (1967) 385 U.S. 374, 388 [17 L.Ed.2d 456, 467, 87 S.Ct. 534].) Free speech must "embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." (*Thornhill* v. *Alabama* (1940) 310 U.S. 88, 102 [84 L.Ed. 1093, 1102, 60 S.Ct. 736].) The commercial nature of an enterprise does not introduce a nonspeech element or relax the scrutiny required by the First Amendment. (*First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765, 786, fn. 23 [55 L.Ed.2d 707, 724, 98 S.Ct. 1407]; *Buckley* v. *Valeo* (1976) 424 U.S. 1, 16 [46 L.Ed.2d 659, 686, 96 S.Ct. 612]; *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, 266 [11 L.Ed.2d 686, 698]; *Joseph Burstyn, Inc.* v. *Wilson, supra,* 343 U.S. 495, 501-502 [96 L.Ed.2d 1098, 1105-1106].)

The electronic media are also entitled to First Amendment protection. (See *Red Lion Broadcasting Co.* v. *FCC* (1969) 395 U.S. 367, 386 [23 L.Ed.2d 371, 386, 89 S.Ct. 1794]; *Columbia Broadcasting* v. *Democratic Comm.* (1973) 412 U.S. 94, 101-102 [36 L.Ed.2d 772, 782-783, 93 S.Ct. 2080]; *United States* v. *Paramount Pictures* (1948) 334 U.S. 131, 166 [92 L.Ed. 1260, 1297, 68 S.Ct. 915].) Television broadcasting poses "unique and special problems not present in the traditional free speech case." (*Columbia Broadcasting* v. *Democratic Comm., supra,* 412 U.S. 94, 101 [36 L.Ed.2d 772, 782]; *Red Lion*

*Broadcasting Co.* v. *FCC, supra*, 395 U.S. 367, 388 [23 L.Ed.2d 371, 387]; see *Buckley* v. *Valeo, supra*, 424 U.S. 1, fn. 55 at p. 50 [46 L.Ed.2d 659, at p. 705].) Nonetheless, the First Amendment precludes censorship of programming content even where the restraint is designed to protect children. (See Note, *Regulation of Program Content to Protect Children After Pacifica* (1979) 32 Vand.L.Rev. 1377, 1410-1411.) "Congress intended to permit private broadcasting to develop with the widest journalistic freedom consistent with its public obligations." (*Columbia Broadcasting* v. *Democratic Comm., supra*, 412 U.S. 94, 110 [36 L.Ed.2d 772, 787].)

Appellant does not seek to impose a prior restraint on speech; rather, she asserts civil liability premised on traditional negligence concepts. But the chilling effect of permitting negligence actions for a television broadcast is obvious. "The fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute." (*New York Times Co.* v. *Sullivan, supra*, 376 U.S. 254, 277 [11 L.Ed. 2d 686, 704].) Realistically, television networks would become significantly more inhibited in the selection of controversial materials if liability were to be imposed on a simple negligence theory. "[T]he pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive." (*New York Times Co.* v. *Sullivan, supra*, 376 U.S. 254, 278 [11 L.Ed.2d 686, 705].) The deterrent effect of subjecting the television networks to negligence liability because of their programming choices would lead to self-censorship which would dampen the vigor and limit the variety of public debate. (*Id.*, at p. 279 [11 L.Ed.2d at p. 706].)

■ Although the First Amendment is not absolute, the television broadcast of "Born Innocent" does not, on the basis of the opening statement of appellant's attorney, fall within the scope of unprotected speech. Appellant concedes that the film did not advocate or encourage violent acts and did not constitute an "incitement" within the meaning of *Brandenburg* v. *Ohio, supra*, 395 U.S. 444, 447-448 [23 L.Ed.2d 430, 434-435]. Notwithstanding the pervasive effect of the broadcasting media (see *FCC* v. *Pacifica Foundation* (1978) 438 U.S. 726, 748 [57 L.Ed.2d 1073, 1093, 98 S.Ct. 3026]; Note, *The Future of Content Regulation in Broadcasting* (1981) 69 Cal.L.Rev. 555, 580-581) and the unique access afforded children (*F.C.C.* v. *Pacifica Foundation, supra*, 438 U.S. 726, 749 [57 L.Ed.2d 1073, 1093]), the effect of the imposition of liability could reduce the U.S. adult population to viewing only

what is fit for children. (See *Butler* v. *Michigan* (1957) 352 U.S. 380, 383 [1 L.Ed.2d 412, 414, 77 S.Ct. 524].) Incitement is the proper test here. (See *Kingsley Pictures Corp.* v. *Regents* (1959) 360 U.S. 684, 688 [3 L.Ed.2d 1512, 1516, 79 S.Ct. 1362].) In areas outside of obscenity the United States Supreme Court has "consistently held that the fact that protected speech may be offensive to some does not justify its suppression. See, *e.g., Cohen* v. *California*, 403 U.S. 15 (1971)." (*Carey* v. *Population Services International* (1977) 431 U.S. 678, 701 [52 L.Ed. 2d 675, 694, 97 S.Ct. 2010].) Just as the advertising in *Carey, supra*, was not "directed to inciting or producing imminent lawless action and ... likely to incite or produce such action" (*Brandenburg* v. *Ohio, supra*, 395 U.S. 444, 447 [23 L.Ed.2d 430, 434], quoted in *Carey* v. *Population Services International, supra*, 431 U.S. 678, 701 [52 L.Ed.2d 675, 694]), the television broadcast which is the subject of this action concededly did not fulfill the incitement requirements of *Brandenburg*. Thus it is constitutionally protected.

Appellant would distinguish between the fictional presentation of "Born Innocent" and news programs and documentaries. But that distinction is too blurred to protect adequately First Amendment values. "Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine." (*Winters* v. *New York, supra*, 333 U.S. 507, 510 [92 L.Ed. 840, 847, 68 S.Ct. 665].) If a negligence theory is recognized, a television network or local station could be liable when a child imitates activities portrayed in a news program or documentary. Thus, the distinction urged by appellant cannot be accepted. (See Krattenmaker & Powe, Jr., *Televised Violence: First Amendment Principles and Social Science Theory* (1978) 64 Va.L.Rev. 1123, 1169 fn. 253. For a similar conclusion regarding content regulation, see Note, *Regulation of Programming Content to Protect Children After Pacifica* (1979) 32 Vand.L.Rev. 1377, 1410-1411.) "Among free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgement of the rights of free speech ...." (*Whitney* v. *California* (1927) 274 U.S. 357, 378 [71 L.Ed. 1095, 1107, 47 S.Ct. 641] [conc. opn. of Brandeis, J.], overruled by *Brandenburg* v. *Ohio, supra*, 395 U.S. 444 [23 L.Ed.2d 430]; see *Kingsley Pictures Corp.* v. *Regents, supra*, 360 U.S. 684, 689 [3 L.Ed.2d 1512, 1516]; *Zamora* v. *Columbia Broadcasting System* (S.D.Fla. 1979) 480 F.Supp. 199, 206.) The trial court's determination that the First Amendment bars appellant's claim where no incitement is alleged must be upheld.

Appellant argues from *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40 [123 Cal.Rptr. 468, 539 P.2d 36], that the First Amendment should not bar a negligence action. In *Weirum*, the California Supreme Court upheld a jury finding that a Los Angeles rock radio station was liable for the wrongful death of a motorist killed by two teenagers participating in a contest sponsored by the station. The court emphasized that the youthful contestants' reckless conduct was stimulated by the radio station's broadcast. (*Id.*, at p. 47.) Limiting its ruling, the court indicated that "[t]he giveaway contest was no commonplace invitation to an attraction available on a limited basis. It was a competitive scramble in which the thrill of the chase to be the one and only victor was intensified by the live broadcasts which accompanied the pursuit. . . . In [other] situations there [was] no attempt, as here, to generate a competitive pursuit on public streets, accelerated by *repeated importuning* by radio to be the very first to arrive at a particular destination." (*Id.*, at p. 48; italics added.) Disposing of the radio station's First Amendment claim, the court said: "Defendant's contention that the giveaway contest must be afforded the deference due society's interest in the First Amendment is clearly without merit. The issue here is civil accountability for the foreseeable results of a broadcast which created an undue risk of harm to decedent. The First Amendment does not sanction the infliction of physical injury merely because achieved by word, rather than act." (*Id.*) Although the language utilized by the Supreme Court was broad, it must be understood in light of the particular facts of that case. The radio station's broadcast was designed to encourage its youthful listeners to be the first to arrive at a particular location in order to win a prize and gain momentary glory. The *Weirum* broadcasts actively and repeatedly encouraged listeners to speed to announced locations. Liability was imposed on the broadcaster for urging listeners to act in an inherently dangerous manner. No such urging can be imputed to respondents here. Appellant only alleges that the teenage viewers of "Born Innocent" acted on the stimulus of the broadcast rather than in response to encouragement of such conduct. *Weirum* does not control the present case.

Appellant also relies on *FCC* v. *Pacifica Foundation, supra*, 438 U.S. 726 [57 L.Ed.2d 1073]. But the narrowness of the *Pacifica* decision precludes its application here. "We simply hold that when the Commission finds that a pig has entered the parlor, the exercise of its *regulatory* power does not depend on proof that the pig is obscene." (*Id.*, at pp. 750-751 [57 L.Ed.2d at pp. 1094-1095]; italics added.) Furthermore, Justice Powell in his concurrence emphasized that the court

is not free "to decide on the basis of its content which speech protected by the First Amendment is most 'valuable' and hence deserving of the most protection, and which is less 'valuable' and hence deserving of less protection." (*Id.*, at p. 761 [57 L.Ed.2d at p. 1101] [conc. opn. of Powell, J.].) As the United States District Court indicated in *Zamora v. Columbia Broadcasting System, supra*, 480 F.Supp. 199, 206, reliance on *FCC* v. *Pacifica Foundation* "is misplaced because of both the factual and legal bases for that decision." Other methods of controlling violence on television must be found. *Pacifica* deals with regulation of indecency, not the imposition of general tort liability. Imposing liability on a simple negligence theory here would frustrate vital freedom of speech guarantees. *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997], is also to be distinguished: There the United States Supreme Court recognized the power of the states to impose civil liability for defamation "so long as the States [do] not impose liability without fault." (418 U.S. at p. 339 [41 L.Ed.2d at p. 804].) The holding does not extend more broadly to tort liability for speech in areas outside the law of defamation.

The judgment is affirmed.

Caldecott, P. J., and Poché, J., concurred.

A petition for a rehearing was denied January 6, 1982, and appellant's petition for a hearing by the Supreme Court was denied February 3, 1982. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.