120 N.J. Super. 416 (1972)
294 A.2d 624
WILLIAM R. SILLERY, PLAINTIFF,
v.
JAMES FAGAN AND MARIA FAGAN, HIS WIFE, DEFENDANTS.
Superior Court of New Jersey, Bergen County District Court.
Decided July 24, 1972.
*417 Mr. Harry H. Chandless, Jr., Attorney for Plaintiff.
Mr. John J. Dudas, Jr. (Bergen County Legal Services Assurance Corporation), Attorney for co-defendant, Cross-Claimant Maria Fagan.
*418 PAUL R. HUOT, J.D.C.
The question which this case presents is based upon a well established theory, namely, that it is the husband's responsibility to provide "necessities" for his wife. Specifically, the issue is whether a wife can be held liable for medical necessities provided for her while giving birth to a child, when no written agreement had been entered into by her with the hospital or its staff and her husband was with her, living at home.
The facts in this case have been stipulated. Defendants Maria Fagan and James Fagan were living as husband and wife at the time services were rendered. They are now separated and defendant husband is not before the court. While defendants lived together defendant Jams Fagan gave his wife approximately $60 a week for household expenses and occasionally paid other household expenses.
From June 25 to July 2, 1969 defendant Maria Fagan was a patient in the Englewood Hospital. Medical services were rendered in connection with the birth of her sixth child in the amount of $250. The amounts are stipulated to be fair and reasonable.
When Mrs. Fagan originally entered the hospital there was no written agreement concerning the charges for the services rendered to her. All bills in this matter were in the name of her husband, James Fagan, but demand for payment was made upon Maria Fagan before the institution of this suit.
The question raised is whether a woman may be held liable for medical necessities provided to her at a time when she is married and living with her husband.

I
The landmark case in this area is of French vintage and was decided in 1659. It was translated and used as the basis of the English decisions. Manby v. Scott, 1 Sid. 109, was brought in the Exchequer Chamber on assumpsit for goods supplied to defendant's wife after defendant had given notice *419 that he would not pay for them. The court held for defendant, but the case is important because it stated the underlying theory which became the cornerstone of the common law rule governing the responsibility of a husband for his wife. The case was cited as authority in England because, it is said, it involved the two sexes and "related to acts of wives, who are, by the law of this country and the law of God, accounted identical with their husbands * * *."
I. Whether every law but our own imposes on a husband the duty of maintaining his wife? The laws of God, of nature, and of nations, tend greatly to promote and encourage matrimony, as the cause to which man owes the successive propagation and continuance of his race; and it never can be supposed that laws which encourage such a state, would place either of the parties to it beyond their care, or expose them to the evils arising from separation, from cold and hunger. Holy scripture enjoins husbands, quod amore afficiant uxores suas. Therefore any neglect of wives can be considered in no more favorable light than a contempt of this ordinance, which, however, it is emphatically our duty to observe, emphatically because, before the sanction of divine authority, it was a law of nature, written on the hearts of all men, of which the practice of all nations is sufficient testimony. And though hardly any law gives the husband so much power on marriage as our own (the civil law, for instance, did not), nevertheless all laws oblige the husband to maintain his wife.
In Manby v. Scott, the court sets forth reasons for the husband's liability for necessaries to the wife:
For nobody will dispute that usually the contracts of wives are void, as all their power is transferred to the husband by their marriage. Yet, as to matters necessary "ad sustentationem vitae," this power is not transferred, but, on the contrary, established and made absolute in the wife by means of the marriage. This is founded on the necessity of the thing * * * that our law imposes a liability on persons in cases where * * * the support of families * * * are concerned * * *
The court in Manby v. Scott then sets down numerous reasons why wives should be supplied necessaries:
1. As our law gives all that the wife has to her husband on marriage, if wives shall not be allowed to obtain food and other necessaries, *420 wives will be in a worse condition than those who commit treason or felony.

* * * * * * * *
5. If husbands shall not be bound by the contracts of their wives for necessaries, without their real assent, husbands may abandon their wives without just cause, when they desire to have others, and thus cause them to perish; and therefore it is more consonant to reason to say, that husbands shall be liable for the contracts of their wives for necessaries, on an assumpsit in law; or that, by marriage, a power is given to wives by the law to take all things necessary for support, by which contracts the husband shall be, during the marriage, irrevocably bound. And thus shall a security be provided for the wife against being stripped on each ungrounded suspicion, and of being starved on each wanton displeasure of her husband.
Manby v. Scott does base the theory on the common law necessity to protect women because of their lack of rights under the law: "If the law willed to empower wives to contract, the same law would also have given them property, that they might retain."
The modern English cases which are most frequently referred to on this subject are Montague v. Benedict, 3 B. and C. 631 (1825), and Seaton v. Benedict, 5 Bing. 28 (1828), which follow the doctrine or theory handed down in Manby v. Scott.

II
The term "necessaries" in the law of husband and wife has been defined in many different ways according to the circumstances and conditions of the parties involved.
Generally it may be said that a wife has the implied authority as agent of her husband, during his absence, to bind him for medical services which he would have been obligated to have supplied, but that she cannot bind him when he is under no obligation to furnish such services. [71 A.L.R. 659]
The type of medical services involved is not the over-riding factor; rather, it is the status of the relationship of the husband and wife. In Vaughan v. Mansfield, 229 Mass. 352, 118 N.E. 652 (Mass. Sup. Jud. Ct. 1918), the court *421 held the wife to have implied authority, as her husband's agent, to contract for medical services for herself and her child, which are reasonably necessary, in the absence of proof that she has been instructed by him not to run such bills. In Daly's Astoria Sanatorium v. Blair, 161 Misc. 716, 291 N.Y.S. 1006 (Mun. Ct. 1936), the court held in an action by a private hospital (against a husband living apart from his wife) that a prima facie case was made out by the hospital upon a showing that medical services were furnished to the wife. Mere proof of separation of husband and wife does not relieve the husband of liability for medical services rendered to the wife. In Overton v. Nordyke, 10 La. App. 317, 120 So. 544 (La. App. 1929), a wife, who had been deserted by the husband, had the implied authority, as her husband's agent, to contract with a physician for medical services for herself.
There are numerous cases which hold medical services rendered to a wife to be "necessaries." Kraft v. Wolf, 15 Ohio Dec. 554 (1905); In re Koretzky's Estate, 180 Misc. 108, 40 N.Y.S. 2d 928 (Sur. Ct. 1943); Johnson v. Coleman, 13 Ala. App. 520, 69 So. 318 (Ala. App. 1915); Zeigler v. David, 23 Ala. 127 (1853); Bevier v. Galloway, 71 Ill. 517 (1874) and Mayhew v. Thayer, 74 Mass. 172 (1857).
Medical services, which have been considered "necessaries," are usually for a wife or child within the family unit. But a wife has no authority to bind her husband if it is beyond the scope of the family. In Baker v. Witten, 1 Okl. 160, 30 P. 491 (Okl. Sup. Ct. 1892), the wife had no implied authority, as her husband's agent during his absence, to engage medical services for an employee injured by their son on the husband's farm. Medical services rendered to an adult daughter, living as a member of the family, was found to be beyond the implied authority of the wife. Breuer v. Dowden, 207 Ky. 12, 268 S.W. 541 (Ky. Ct. App. 1925).
Special circumstances create exceptions to the general rule. Thus, in Kerner v. Eastern Dispensary and Casualty Hospital, *422 210 Md. 375, 123 A.2d 333 (Md. Ct. App. 1956), the husband was found not liable for hospital expenses where they had been separated for 30 years due to no fault of the husband. However, where the separation is caused by the husband, he has been held liable for necessaries. Hall v. Weir, 1 Allen 261 (Mass. Sup. Jud. Ct. 1861); Ott v. Hentall, 70 N.H. 231, 47 A. 80 (N.H. Sup. Ct. 1900); De Brauwere v. De Brauwere, 203 N.Y. 460, 96 N.E. 722 (Ct. App. 1911); and Weiserbs v. Weiserbs, 169 N.Y.S. 111 (Sup. Ct. 1918). Where the wife is of independent means, there seems to be a finer line as to what actually is or is not a necessity. In Connerat v. Goldsmith, 6 Ga. 14 (Sup. Ct. 1849), the court held the wife liable for furniture purchases where she was of independent means and pledged her own note.

III
The more recent cases in New Jersey follow the common law doctrine of the husband's responsibility as to support for necessities of his wife and children. In Tracey v. Tracey, 69 N.J. Super. 382 (App. Div. 1961), the court held the common law duty of a husband to support his wife and children is a continuing obligation enduring throughout continuance of the marital relation, including time during which a suit for divorce between the parties is pending.
In the case of Turi v. Turi, 34 N.J. Super. 313 (App. Div. 1955), the court said:
The duty of a husband to provide suitable support and maintenance for his wife has long been recognized and enforced in this State. This duty is his primary obligation and arises out of the status of wedlock by reason of public policy recognized and enforced by civil and common law, and by the legislation incorporated in N.J.S. 2A:34-23 and 24, N.J.S.A. (formerly N.J.S.A. 2:50-37 and 38). Sobel v. Sobel, 99 N.J. Eq. 376, 378-379 (E. & A. 1926); Bonanno v. Bonanno, 4 N.J. 268, 273 (1950). Such common law obligation to support the wife continues during the existence of the marital relationship.
*423 The husband's duty to provide "necessaries" to a wife is deeply imbedded in the public policy of New Jersey. In Smedley v. Sweeten, 11 N.J. Super. 39 (App. Div. 1951), the relation of principal and agent was found not to be inherent in the marital relation, but if the husband wrongfully left the wife without means of subsistence, she became an agent of necessity to supply her wants on his credit. The court indicated that the support of the wife and child is the husband's responsibility once the "vows" are taken. Only by fault of the wife or where she is provided for can the husband escape liability. In St. Mary's Hospital v. Paxton, 10 N.J. Misc. 514 (Sup. Ct. 1932), where the spouses had separated by mutual consent, and it was shown that provision had been made for the wife, the hospital could not recover against the husband for services to the wife. The court said:
Where the husband and wife are living in a state of separation, the presumption is against the authority of the wife to bind the husband by her contract. Under such circumstances the general rule is that the husband is not liable. To this rule there are two exceptions pertinent to this inquiry, the first of which is where husband and wife separate and live in a state of separation by mutual consent, without any provision for her maintenance or means of her own for her support; the other, where the wife leaves her husband under the stress of his misconduct of such a character as in law is regarded as justifiable cause for the wife's quitting her husband's society. In such cases, the presumption being against the liability of the husband for the wife's contract, the burden of proof is upon the party seeking to enforce against him a liability for her contract. He must show affirmatively the special circumstances which shall fix the responsibility on the husband in order to establish his cause of action. [at 515]
There are no facts in this case that indicate the reason for the separation of the defendants. But it would not matter because the services were rendered while the parties resided together.
Other types of "necessities" to which a wife is entitled is determined by the husband's status in society. "Where husband and wife are living together, the wife has implied authority to pledge her husband's credit for such things as fall within the domestic department ordinarily confided to *424 her management, and for articles furnished to her for her personal use suitable to the style in which the husband chooses to live." Gimbel Bros., Inc. v. Barrett, 109 N.J.L. 63 (E. & A. 1932). It is a question for the trier of the facts as to whether any certain item is a necessary to which their station in life and his financial standing entitled her.
It is obvious that under our facts James Fagan is liable for the medical services rendered to his wife and newborn child.

IV
But the problem raised here is whether the underlying theory creates exclusive liability in the husband so that a creditor may not recover from the wife for necessities.
If a third person provides necessaries to a wife, the liability of the husband may be based either (1) upon his consensual contract to pay for them, made either by him directly or through his wife as agent, or (2) upon his neglect or refusal to perform a legal duty to provide necessaries for his wife.
In some instances it has been held, applying the principles of law of restitution, that a person who has performed non-contractual duty of another by supplying a third person with necessaries which, in violation of such duty, the other has failed to supply, is entitled to restitution from the other. 60 A.L.R.2d 14.
In order that one who has furnished necessaries to the wife may recover from the husband under the rules of an agency or authority, it must appear that the husband is guilty of a breach of duty; it must appear that he had a duty to supply necessaries or the means of acquiring them, and that he failed to do so. [60 A.L.R. 2. 14]
It is the duty of the husband to support and maintain his wife and family. Hollingshead v. Hollingshead, 91 N.J. Eq. 261 (Ch. 1920); Furth v. Furth, 39 A. 128 (Ch. 1898). There is not only a moral obligation resting on the husband *425 to support his wife, but also a duty imposed by law. Barefoot v. Barefoot, 83 N.J. Eq. 685 (E. & A. 1914).
In Ewell v. State of Maryland, 207 Md. 288, 114 A.2d 66 (Md. Ct. App. 1955), defendant husband was found guilty of wilfully neglecting to provide for support and maintenance of his wife under a criminal statute. The court said:
Statutes have been passed in almost all of the States which have made failure of the husband to perform his duty of support, unless adequately excused, a crime. * * * They have carried over into the testing of the criminal offense the same standards applied at common law to necessaries and what constituted them.
The duty of the husband to support the wife flows from, and depends upon, the marriage relation. Boehm v. Boehm, 88 N.J. Eq. 74 (Ch. 1917). It has been declared that the duty of a husband to provide for the support and maintenance of the wife remains so long as the relation of husband and wife exists between the parties. As stated previously, if the parties are separated, the husband's liability usually depends upon whose fault it is that they are separated. If it is by mutual consent, and the wife is adequately taken care of, the husband will normally not be held liable.
Even in cases where the husband is not made a party, the wife is usually found not liable if the goods are necessaries. In Davenport v. Rutledge, 187 S.W. 988 (Tex. Civ. App. 1916), a wife was sued for medical services rendered to her child and the husband was served by publication. On appeal, judgment against the wife was reversed and remanded, the husband being in default, with the court saying:
In order to make the wife personally responsible for the services, she must have entered into a contract with the appellee for services rendered necessary to her child. If there was no such contract, and she only acquiesced or consented for the doctor to treat the child, this would not bind her personally or make her separate property liable.... It is not sufficient that she merely give an order or call in a physician, for in such case the presumption is that she does so as the agent of her husband, whose duty it is to supply such things. * * * She would not be bound personally for the default of her husband by such verbal promise to pay his debt. [at 990]
*426 A view of the public policy of New Jersey with respect to the family unit indicates that medical services which are supplied to a wife and newborn baby is the obligation of the husband. New Jersey is concerned with maintaining the marital relationship, and the neglect or failure of the husband to perform his legal duty, which arises from the marriage relation, creates his liability for such "necessaries."
However, in the recent case of Imer v. Risko, 56 N.J. 482 (1970), our Supreme Court abolished the theory of interspousal immunity in automobile negligence cases. In so doing the court noted that "At common law, a husband and wife were regarded as one, the legal existence of the wife being merged with that of the husband." It continued to say that "This fictitious concept was largely dissipated by the widespread enactment of `Married Women's Acts' in the mid-nineteenth century. These acts were designed primarily to secure a married woman a separate legal identity and to grant her some of the rights theretofore denied her at common law." The New Jersey Married Persons Act, N.J.S.A. 37:2-1 et seq., is generally in accord with the legislation of other states. Although Immer v. Risko does not concern "necessaries," it does evidence another inroad upon the long-held common law view of the husband-wife relationship and a weakening of this legal concept. In Long v. Landy, 35 N.J. 44 (1961), the theory of the legal identity of husband and wife was referred to as "artificial and technical." In that case a widow was allowed to maintain an action against her deceased husband's estate. In so holding the court said:
The nature of the common law requires that each time a rule of law is applied it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice." State v. Culver, 23 N.J. 495, 505 (1957). When the policy behind a rule no longer exists the rule should disappear. Johnson v. Peoples First National Bank & Trust Co., supra [394 Pa. 116] [at 50]
*427 Plaintiff urges that, indeed, the times have changed and that continued application of the common law rule is an instrument of injustice.
It must be conceded by all that the status of women in 1971 is not the same as it was in 1659. But, that is true of society in general. "The laws of God, of nature, and of the nations, tend clearly to promote and encourage matrimony, as the cause to which man owes the successive propagation and continuance of his race" says Manby v. Scott, supra. But, whether that be true or not today, is it cognizable by the court?
The use of prayer is prohibited in tax-supported schools. Chamberlin v. Dade County Road of Public Instruction, 377 U.S. 402, 84 S.Ct. 1272, 12 L.Ed.2d 407 (1964); atheism is protected as an exercise of free speech. Kingsley International Pictures Corp. v. Regents of University of New York, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959), and the law of God has no power to bind those who have no belief in him.
What are the laws of nature? Are they evidenced by a song that was popular 25 years ago called "Doing What Comes Naturally" or do these laws come from man's intellect rather than his emotions. In 1659 it was believed that homosexuality was violative of the laws of nature, and yet today, society's belief that such acts were unnatural is being eliminated.
Similarly, the laws of nations today have dramatically changed in this area. Divorce was then unknown. Divorce in England was not established until the close of the 17th Century, and then only by Parliament. It was not until 1857 that a secular divorce court was created, and even then it could only grant an absolute divorce in cases of adultery. The laws of nations, of other states in this nation, and of New Jersey, have changed since 1659. And New Jersey has recently passed a new divorce and annulment act in response to the needs of a changing society. See L. 1971, c. 212, which permits support to be awarded in favor of the husband and *428 paid by the wife. That wives may be required to pay alimony to their husband is recognized by the Internal Revenue Code of 1954, § 7701.
Society's views on birth control and legalized abortion are also in a state of flux. In Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Supreme Court held that a statute which prevented medical advice as to the different forms of contraception was invalid as an unconstitutional invasion of the right of privacy of married persons. The mere fact that a statute of this type was still in effect in the 1960's is proof of the changing atmosphere of our times.
There are numerous cases now holding abortion statutes unconstitutional because they deprive single women and married couples of their right, secured by the Ninth Amendment, to choose whether to have children. Babbitz v. McCann, 310 F. Supp. 293 (E.D. Wis. 1970); Roe v. Wade, 314 F. Supp. 1217 (N.D. Tex. 1970). The inclusion of these new "freedoms" illustrates the rapidly changing status of the family as a unit.
So today, a court cannot say as did the Manby court: "The laws of God, of nature, and of the nations, tend clearly to promote and encourage matrimony, as the cause to which man owes the successive propagation and continuance of his race; * * *."
Since the "laws of God, of nature and of nations" have been diluted, abrogated, ignored or defied increasingly over the past 300 years, and since they formed, as it were, the premises of the syllogism, is the conclusion still valid?
The status of women has changed in New Jersey over the years. In 1877 laws were enacted which permitted women to retain personal property as a separate estate; to contract as a femme sole; and to absolve a husband from liability for the debts of his wife contracted before marriage. In 1912 women were permitted to sue or be sued without the necessity of joining the husband as a party to the action. In 1929 *429 wives became responsible for their torts. The 19th Amendment to the United States Constitution was adopted by New Jersey in 1920. This was two years after England permitted women who were 30 years of age and owners of realty to vote. In 1928 England eliminated the property requirement and reduced the age to 21 years. Of interest, but not important to this determination, is that the 19th Amendment was not adopted by the State of Florida until May 13, 1969.
N.J.S.A. 37:2-1 et seq.  the Married Women's Act  was adopted to relieve women of the disability of coverture. Patusco v. Prince Macaroni, Inc., 50 N.J. 365.
It has taken 1500 years for married women to regain the rights they held under Anglo-Saxon law in the latter part of the 5th Century. At that time a married woman could hold her own property, prosecute legal action, act as a witness, make her own will and obtain a divorce by mutual consent. Knapper, Constitutional and Legal History of England, 72 (1942).
In recent years the Legislature of New Jersey has established as its public policy that discrimination based on sex or marital status is of concern to the government of this State and is a threat to the rights and privileges of the citizens of New Jersey, and a nuisance to the institutions and the foundation of a free democratic state. N.J.S.A. 10:5-3.
Pursuant to the policy there expressed, the Legislature has enacted and the Governor has signed laws which prohibit discrimination in accommodations, facilities or privileges on account of marital status or sex (N.J.S.A. 10:1-3); respecting the qualifications of jurors (N.J.S.A. 10:1-8); with respect to burial (N.J.S.A. 10:1-9); with respect to employment in the production or distribution of military equipment or supplies (N.J.S.A. 10:1-10); with respect to employment in public works (N.J.S.A. 10:2-1); with respect to general employment and accommodations and privileges (N.J.S.A. 10:5-4); with respect to employment *430 (N.J.S.A. 10:5-12); with respect to public educational institutions (N.J.S.A. 18A:6-6); with respect to State competitive scholarships (N.J.S.A. 18A:71-6).
N.J.S.A. 17:12B-146 prohibits discrimination by mortgagees because of race, creed, color, national origin or ancestors. This section has not been specifically amended to include marital status or sex; however, N.J.S.A. 10:5-12(i) prohibits discrimination by reason of sex or marital status by any bank, banking organization, mortgage company, insurance company or other financial institution or lendor to whom application is made for financial assistance for the purchase or repair of any real property.
Judicial notice must be taken of the efforts of the Womens Liberation movement to end all inequity between the sexes. New Jersey Rules of Evidence, Rule 9(2)(d).
From their public utterances, it must be inferred that this common law rule is to be one of their targets. It is a law which depicts them as weak and dependent with no recognition of their individuality.
Throughout the land is heard the cry, "Give us our rights!" It is being heard from every segment of society: ethnic groups, economic groups, the various age groups, religious groups, regional, area, county and local groups, and currently stridently from the more militant of our women.
The court accepts the oft-stated principle that every right carries with it a corresponding duty. We recognize that under the common law the rights of women have enjoyed a slow but almost uninterrupted expansion. We at the same time recognize the inescapable logic that the expansion of such rights involves, in fact demands, an equivalent expansion of the responsibilities of women who have been given these greater rights.
While there is no question that defendant James Fagan is liable to plaintiff for the medical services rendered to his wife and child by the Englewood Hospital, this court does not believe that today it is plaintiff's exclusive remedy. *431 This court finds that the action against defendant Maria Fagan is cognizable by it, and that she, as the recipient of the services rendered to her, is liable for the services furnished to her.
This court does not find a similar change in the laws relating to the obligation of a father to support his child, but does note the recent New York case which held a parent's obligation to financially support his child ends when the child refuses to obey the parent's orders. 94 N.J.L.J. 677 (July, 1971).
There will, therefore, be a judgment in favor of the plaintiff against defendant Maria Fagan for $250.