GASCOE, LTD., a Pennsylvania corporation, t/a American Home Theatres

v.

NEWTOWN TOWNSHIP, BUCKS COUNTY, a municipal organization of the Commonwealth of Pennsylvania; the Board of Supervisors of Newtown Township, an executive authority established pursuant to the laws of the Commonwealth of Pennsylvania; Nancy Smithson; Vincent Lombardi; John McGurney; David Evans and Donald Williams, Individually and as members of the Board of Supervisors, jointly, severally and in the alternative.

Civ. A. No. 88–7131.

United States District Court, E.D. Pennsylvania.

Oct. 24, 1988.

Richard B. Gelade, Trenton, N.J., for plaintiff.

Stephen B. Harris, Warrington, Pa., for defendants.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

This case calls into question the precise issue left unanswered by the United States Supreme Court's trio of decisions in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), and *Young v. American Mini-Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed. 2d 310 (1976); namely, whether a municipality may, consistent with the First and Fourteenth Amendments, use its zoning power to prohibit entirely the distribution of adult films within its jurisdiction. This court holds that it may not. Such an ordinance inflicts an unconstitutionally overbroad prior restraint on free speech by failing to institute procedural safeguards which limit the restrictions to films satisfying the Supreme Court's definition of obscenity.

## I. FACTS

A brief recitation of the facts in this case reveals the inevitable conflict between the First Amendment and the video age. Plaintiff, Gascoe, Ltd., is a Pennsylvania corporation doing business as American Home Theatres. On August 7, 1987, plaintiff entered into a lease agreement with Newtown Village Partnership to lease property in a shopping center in Bucks County, Pennsylvania, known as Village at Newtown Marketplace, for the express purpose of renting and selling recorded and blank videotape cassettes and related equipment to the public. Pursuant to the municipal zoning ordinance, plaintiff made application for a conditional use permit to the Newtown Township Planning Commission. On August 9, 1988, the Planning Commission recommended approval to the Newtown Township Board of Supervisors.

At a public hearing held by the Board of Supervisors on August 30, 1988, plaintiff represented that it intended to rent and sell "adult" films which, based on prior calculations, would account for between 10 and 25 percent of its total business. As a result of this statement, the Board of Supervisors voted unanimously to deny conditional use approval. The Board initially found that the application of American Home Theatres failed to satisfy the provisions of Section 1301(B) of the township's Joint Municipal Zoning Ordinance, which reads in pertinent part:

2. An improvement which shall not be a detriment to the property in the immediate vicinity and which shall be in the best interests of the municipality, the benefit of the community and the public welfare.

In a letter of September 12, 1988, the Township Solicitor clarified the Board's position as follows:

Renting and selling adult films in a shopping center which is open to the general public and which is frequented by persons of all ages and both sexes is not in the interests of the municipality, will not benefit the community and will not further the public welfare. The rental and sale of films which are x-rated for sensuality is offensive to the citizens of Newtown Township and must be prohibited.

Upon its application for reconsideration, plaintiff objected to the Board's decision to exclude all x-rated videos from distribution. Plaintiff argued that such a comprehensive ban necessarily encompassed material protected by the First Amendment. Although plaintiff conceded the validity of reasonable restrictions on the sale, rental and advertising of its adult fare, it believed that the standard practices of American Home Theatres in cordoning off x-rated films from its mainstream inventory would alleviate the Board's concern for the community welfare. As an illustration of its procedures, plaintiff submitted to the Board several lease provisions [1] governing the rental of adult videos at other American Home The-

---

1. In a letter dated September 7, 1988, plaintiff's attorney offered to include the following clause in their lease with Newtown Village Partnership:

"The sale and rental by tenant of x-rated and adult oriented materials shall not be construed to be a violation of this lease agreement provided that (1) the x-rated and adult oriented materials shall be in a separate area toward the rear of the leased premises; (2) such separate area shall not be visible from the exterior of the leased premises; (3) tenant shall not display advertisements for such x-rated and adult tapes on the exterior door or windows of the leased premises nor in that portion of the interior of the premises to which the general public has access; and (4) such separate area shall not measure more than 500 square feet in area."

In addition, plaintiff included the following provisions from its lease agreement for its store in Lower Makefield Township:

"Tenant agrees that throughout the term of this lease, and in any renewals thereof, it will: ... (2) comply with and abide by any existing ordinance or any ordinance enacted in the future related to the sale and exhibition of video products and adult materials found to be lawful provided that said ordinance does not declare that the operation of the video store or the sale or exhibition of adult material in the shopping center is an illegal use and activity. If, however, a lawfully enacted ordinance is adopted rendering the video store or exhibition or sale of adult material in the shopping center illegal, the Township will certify the Tenant as having a non conforming use and Tenant shall enjoy all of the rights thereunder; or (3) not sell or exhibit any materials found to be pornographic by a court of competent jurisdiction in the Commonwealth of Pennsylvania or by the United States Supreme Court."

atre outlets and assured compliance with any local ordinance regulating the sale or rental of "obscene" materials.

Despite these assurances, the Board of Supervisors once again denied plaintiff's application for a conditional use permit, but narrowed its definition of objectionable videos to those which would violate the Newtown Township Obscenity Ordinance. Modeled after the Pennsylvania Obscenity Act, 18 Pa.Cons.Stat. § 5903 (Purdon 1983), the ordinance adopts verbatim the Supreme Court's definition of obscenity as enunciated in *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614–15, 37 L.Ed.2d 419 (1973). In a letter dated September 19, 1988, the Board stated that obscene videos are those which:

 a.) The average person applying contemporary community standards, would find that the subject matter taken as a whole appeals to the prurient interest;

 b.) The subject matter depicts or describes in a patently offensive way sexual conduct, of a type hereinafter described; and

 c.) The subject matter taken as a whole lacks serious literary, artistic, political or scientific value.

The Board then included in its letter the ordinance's definition of patently offensive material.[2]

Plaintiff now brings this action alleging that defendants' refusal to issue a conditional use permit pursuant to section 1301(B) of the Zoning and Planning Ordinance and the Newtown Township Obsceni-ty Ordinance is an unconstitutional prior restraint on plaintiff's right to free speech under the First and Fourteenth Amendments and 42 U.S.C. § 1983. Plaintiff moves for an injunction requiring the issuance of a conditional use permit, declaratory relief holding the ordinances unconstitutional, both on their face and as applied, monetary damages incurred due to delay in commencing business, and attorney's fees.

## II. DISCUSSION

### A. *Standing*

■ As a threshold matter, defendants assert that plaintiff, a corporation, lacks standing to invoke the protection of the First and Fourteenth Amendments. While this issue as stated remains subject to debate, defendants' argument ignores the essential holding of the Supreme Court's decision in *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), which acknowledged the "significant *societal* interests" served by the First Amendment. *Id.* at 776, 98 S.Ct. at 1415 (emphasis added). As summarized in the Court's subsequent decision in *Pacific Gas & Elec. Co. v. Public Util. Comm'n.*, 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986), "[t]he identity of the speaker is not decisive in determining whether speech is protected. Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Id.* at 8, 106 S.Ct. at 907, *quoting, First*

---

**2.** The Newtown Township Obscenity Ordinance defines patently offensive material as follows: "Patently offensive," means conduct so offensive on its face as to affront current standards of decency, and shall be deemed to include any of the following described forms of sexual conduct, if they are depicted so as to affront current standards of decency:

 a.) An act of sexual intercourse, normal or perverted, actual or simulated, real or animated, including genital-genital, anal-genital or oral-genital intercourse, whether between human beings or between a human being and an animal.

 b.) Sadomasochistic abuse meaning flagellation or torture or sexual gratification, by or upon a person who is nude or clad in undergarments or in a revealing costume, or the condition or [sic] being fettered, bound or otherwise physically restrained on the part of the one so clothed.

 c.) Masturbation, excretory functions, and lewd exhibition of the genitals, including any explicit close-up representation of a human genital organ or spread-eagle exposure of female genital organs.

 d.) Physical contact or simulated physical contact with the clothed or naked pubic area or buttocks of a human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex, or between humans and animals in an act of apparent sexual stimulation or gratification.

 e.) Fellatio, cunnilingus, anal sodomy, seminal ejaculation, or any excretory function.

*National Bank of Boston v. Bellotti, supra,* 435 U.S. at 783, 98 S.Ct. at 1419. *See also Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 533–35, 100 S.Ct. 2326, 2330–32, 65 L.Ed.2d 319 (1980). This argument is especially compelling when the corporation is in the business of conveying speech to the public at large. *Bellotti, supra* 435 U.S. at 783, 98 S.Ct. at 1419; *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 389–390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969).

Although the sale and rental of videocassettes for profit may not be the classic medium for the communication of core First Amendment speech, the burgeoning role of the video as a unique information source is nonetheless unquestionable. Indeed, the Video Cassette Recorder's (VCR) presence in some 37 million homes has offered both the speaker and listener increased access to the marketplace of ideas. *See generally* Comment, *What Films We May Watch: Videotape Distribution And The First Amendment,* 136 U.Pa.L.Rev. 1263 (1988). Moreover the industry's expansion into the adult genre has been at least commensurate with its growth in the entertainment and information field as a whole. *See* 1 U.S. Department of Justice, Attorney General's Commission on Pornography, Final Report, at 284–91 (1988) (hereinafter "Final Report"). Since the First Amendment clearly protects the distribution of nonobscene adult entertainment, *see Jenkins v. Georgia,* 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974); *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952), plaintiff, as purveyor of allegedly protected speech, is properly situated to claim the safeguards of the First Amendment regardless of its rights to corporate self-expression. *See* Brudney, *Business Corporations And Stockholders Rights Under The First Amendment,* 91 Yale L.J. 235, 252 (1981).

### B. *The First and Fourteenth Amendment Claims*

Any discussion of the First Amendment's speech clause must begin with the premise that content neutral time, place, and manner restrictions on speech which serve a substantial government interest are not unconstitutional so long as they leave open alternative avenues of communication. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986); *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 807, 104 S.Ct. 2118, 2130, 80 L.Ed. 2d 772 (1984); *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). A municipality's right to use its zoning power in the public interest is perhaps the paradigm of such a valid restriction. In *Young v. American Mini-Theatres,* the Supreme Court upheld Detroit's "Anti–Skid Row Ordinance" which limited the licensing of adult theaters to areas not within 1,000 feet of any two other "regulated uses" or within 500 feet of a residential area. The ordinance defined both "adult theaters" and "regulated uses" in terms which clearly included nonobscene protected speech. The Court, however, found the ordinance to be a reasonable content-neutral regulation. Justice Stevens stated:

> [W]e have no doubt that the municipality may control the location of theaters as well as the location of other commercial establishments, either by confining them to certain specified commercial zones or by requiring that they be dispersed throughout the city. The mere fact that the commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing requirements is not a sufficient reason for invalidating these ordinances.

427 U.S. at 62, 96 S.Ct. at 2448.

The holding in *American Mini–Theatres* was reaffirmed by the Court's decision in *Renton v. Playtime Theatres, Inc., supra,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), which upheld a city ordinance prohibiting adult theaters from locating within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park or school. The Court found that the ordinance was not content-based but rather was narrowly tailored to serve the substantial government interest of controlling the adverse secondary effects of adult theaters

on urban communities. Central to the Court's holding, however, was the fact that the ordinance left open alternative avenues of communication by not precluding but merely regulating the presence of adult theaters in Renton. The Court concluded that "the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city, and the ordinance before us easily meets this requirement." 475 U.S. at 54, 106 S.Ct. at 932.

In *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), the Court struck down an ordinance which exceeded the proscriptions set forth in *American Mini–Theatres* and reaffirmed in *Renton*. The Borough of Mount Ephraim, New Jersey, sought to regulate the exhibition of live nude dancing by blanketly banning live entertainment in commercial establishments within the Borough. The Court rejected the Borough's contentions that the ordinance was directed at the secondary effects caused by live entertainment, such as the need for increased parking, trash, police and medical services. Finding no adequate distinction between the difficulties created by live entertainment and other permitted commercial uses, Justice White noted that "[t]he First Amendment requires that there be sufficient justification for the exclusion of a broad category of protected expression as one of the permitted commercial uses in the Borough." 452 U.S. at 67, 101 S.Ct. at 2181–82. The Court distinguished the ordinance in *Schad* as neither narrowly drawn nor providing for alternative avenues of communication for constitutionally protected speech:

> Here, the Borough totally excludes all live entertainment, including non-obscene nude dancing that is otherwise protected by the First Amendment. As we have observed, *Young v. American Mini Theatres* ... did not purport to approve the total exclusion from the city of theaters showing adult, but not obscene, materials. It was carefully noted in that case that the number of regulated establishments was not limited and that "[t]he

situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech." 427 U.S. at 71, n. 35, 96 S.Ct. at 2453, n. 35.

452 U.S. at 76, 101 S.Ct. at 2186. *See also Renton v. Playtime Theatres, Inc., supra*, 475 U.S. at 52, 106 S.Ct. at 931 ("the Renton ordinance is 'narrowly tailored' to affect only the category of theaters shown to produce the unwanted secondary effects, thus avoiding the flaw that proved fatal ... in *Schad v. Mount Ephraim* "); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213, 95 S.Ct. 2268, 2274, 45 L.Ed.2d 125 (ordinance making it a public nuisance for drive-in movie theater to exhibit film containing nudity when screen is visible from public street is not narrowly drawn so as to satisfy First Amendment).

 The regulatory scheme relied upon by the Newtown Township Board of Supervisors is manifestly more akin to the ordinance in *Schad* than those in *American–Mini Theatres* and *Renton*. By using the zoning permit requirements of section 1301(B) in conjunction with the township's obscenity ordinance, the Board has taken a blunderbuss approach to the regulation of adult films in Newtown Township and effectively placed an unconstitutional prior restraint on American Home Theatres' right to distribute protected films. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Kingsley Pictures Corp. v. Regents*, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959); *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). The case law makes clear that the Board may not attribute obscenity to a film based solely on nondeviate sexual content or an x-rating from the Motion Picture Association of America. *See Schad, supra*, 452 U.S. at 66, 101 S.Ct. at 2181; *Jenkins v. Georgia, supra*, 418 U.S. at 160–61, 94 S.Ct. at 2775; *Neiderhiser v. Borough of Berwick*, 840 F.2d 213, 218 (3d Cir.1988); *Brown v. Pornography Comm'n of Lower Southampton*, 620 F.Supp. 1199, 1217 (E.D.Pa.1985). *See also* 1 Final Report, at 231. It follows, *a fortio-*

*ri,* that the Board may not deny American Home Theatres a permit based on the sale or rental of such films. As the Third Circuit held on facts quite similar to those at bar:

> According to Hollywood [Stereo and Video] the denial of the zoning exemption was based solely on the fact that some of Hollywood's movies were x-rated. Thus, the denial can be viewed as an attempt by the Board members to regulate Hollywood's distribution on the basis of subject matter alone. The first amendment prevents the government from regulating expression "because of its message, its ideas, its subject matter, or its content." *Police Dep't. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). Therefore, if as alleged the denial was based on the subject matter of twenty percent of Hollywood's business, the denial was improper —an unconstitutionally broad stroke, effectively preventing the dissemination of these films without adherence to constitutionally mandated procedures and safeguards.

*Neiderhiser, supra,* 840 F.2d at 218 (footnote omitted).

The fact that the Board subsequently based its denial on the township's obscenity ordinance does not cure the constitutional infirmity of the regulatory scheme. To do so would be to place the proverbial cart before the horse. As the Third Circuit explained in *Neiderhiser:*

> [I]f a restriction based on obscenity is to be imposed, it must be preceded by an examination of the content of that material … The [permit] denial here had [the] effect [of] restricting access to undoubtedly protected speech. The denial might also be characterized as a prior restraint, since it worked to proscribe Hollywood's ability to distribute any films.

840 F.2d at 218, n. 8 (citations omitted). *Accord: Vance v. Universal Amusement Co., Inc.,* 445 U.S. 308, 317, 100 S.Ct. 1156, 1162, 63 L.Ed.2d 413 (1980) (per curiam) ("the absence of any special safeguards governing the entry and review of orders restraining the exhibition of named or unnamed motion pictures, without regard to the context in which they are displayed, precludes the enforcement of these nuisance statutes against motion picture exhibits"); *Southeastern Promotions, supra,* 420 U.S. at 558–62, 95 S.Ct. at 1246–48 (municipal board's denial of permit for production of musical "Hair" at local theater was unconstitutional prior restraint since it lacked procedural safeguards determining obscenity). Hence, any prior restraint on the distribution of films in Newtown Township must comport with procedural standards under the First Amendment as articulated by the Supreme Court in *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

■ In *Freedman,* the Supreme Court reversed the conviction of a Baltimore theater owner for failure to submit a film to the Maryland State Board of Censors on the grounds that the Maryland licensing statute created an unconstitutional prior restraint under the First Amendment. The Court acknowledged Maryland's right to license films within the state, but held that the statute must be accompanied by "procedural safeguards designed to obviate the dangers of a censorship system." 380 U.S. at 58, 85 S.Ct. at 739. In order to withstand constitutional scrutiny, a prior restraint on the distribution of films must satisfy the following criteria: (1) the censor must bear the burden of proving that the film is unprotected speech under the First Amendment; (2) any restraint prior to judicial review must be limited to preservation of the status quo and for the shortest period compatible with sound judicial procedure; and (3) a prompt final judicial determination of obscenity must be made. 380 U.S. at 58–59, 85 S.Ct. at 739.

These procedural standards are especially relevant to the dynamics of the video industry since the VCR implicates the privacy concerns of *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), to a greater extent than the exhibition of films in public theaters. In *Stanley,* the Supreme Court held that the First Amendment, through the Fourteenth Amendment, prohibits the states from making the private possession of obscene films

a crime. Justice Marshall noted that "the Constitution protects the right to receive information and ideas ... regardless of their social worth." 394 U.S. at 564, 89 S.Ct. at 1247 (citations omitted). This right, of course, must be balanced against the state's police power which allows limited intrusion into the home to effectuate substantial government interests. *See, e.g., Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (state may criminalize consensual homosexual sodomy in privacy of home); *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (state may prohibit distribution of child pornography even if material is not legally obscene); *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed. 2d 1073 (1978) (FCC can regulate nonobscene radio monologue during hours when children are likely listeners since listeners are captive audience). But the individual patron's decision to rent or purchase an adult video for private viewing in the home certainly affects the community interest to a lesser degree than the public exhibition of adult films or live adult entertainment. Consequently, any balancing of interests must proceed in favor of the First Amendment's guarantee of free expression for it is well-settled that there is a "heavy presumption" against the constitutional validity of prior restraints. *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). *See also Southeastern Promotions, supra,* 420 U.S. at 558–59, 95 S.Ct. at 1246–47.

### C. *The Newtown Ordinance*

Procedural safeguards are lacking in the Board's system of regulation in several respects. First, section 1301(B) of the Municipal Zoning Ordinance, the section under which plaintiff's conditional use permit was actually denied, fails to apprise an applicant of the requirements of the Newtown Obscenity Ordinance. Although this fact alone is not fatal since plaintiff was eventually made aware of the grounds for the denial, it is noteworthy that the Board's original interpretation of section 1301(B) permitted them to ban all films "x-rated for sensuality." [3] Second, and more importantly, the obscenity ordinance does not, by its own terms, provide for the procedures demanded by *Freedman* and included in the Pennsylvania Obscenity Act, 18 Pa.Cons. Stat. § 5903.

The ordinance's main enforcement mechanism is found in subsection (E) which provides for fines and possible imprisonment upon conviction in a summary proceeding,[4] but retains the right of the Board to "seek any relief provided either in the Joint Municipal Zoning Ordinance, the Pennsylvania Municipalities Planning Code, or at common law including, but not limited to, the right to secure injunctive relief, to issue Cease and Desist Orders and the right to take action to abate a public nuisance." This is in apparent conformity with subsection (k) of the state statute which allows supplemental local regulation not inconsistent with the Act.[5] However, Newtown's obscenity ordinance is *inconsistent* with the Pennsylvania statute in a fundamental and unconstitutional manner. Unlike subsection (g) of § 5903,[6] the ordinance does not provide for a prompt adversarial hearing in which a local court can apply contemporary community standards to determine whether the Board's decision of obscenity

---

**3.** Letter from Stephen B. Harris, Esquire to Gascoe, Ltd., dated September 12, 1988.

**4.** The first paragraph of subsection (E) of the Newtown Township Obscenity Ordinance reads:
> Any person, partnership or corporation who, or which, shall violate the provisions of this Ordinance shall, upon conviction thereof in a summary proceeding, be sentenced to pay a fine of not more than $500.00. In default of payment of the fine, such person, the members of such partnership or the officers of such corporation shall be liable to imprisonment for not more than sixty (60) days. Each day the violation is continued shall constitute a separate offense.

**5.** (k) Ordinances or resolutions.—Nothing in this chapter shall be construed to invalidate, supersede, repeal or preempt any ordinance or resolution of any political subdivision insofar as it is consistent with this chapter, and political subdivisions further retain the right to regulate any activities, displays, exhibitions or materials not specifically regulated by this chapter.
> 18 Pa.Cons.Stat. § 5903(k).

**6.** (g) Injunction.—The attorney for the Commonwealth may institute proceedings in equity in the court of common pleas of the county in which any person violates or clearly is about to violate this section for the purpose of

complies with both the requirements of the ordinance and the constitutional parameters set forth in *Miller v. California, supra*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) and its progeny.

In *ACLU v. City of Pittsburgh*, 586 F.Supp. 417 (W.D.Pa.1984), an injunction was granted against the Mayor of Pittsburgh and other city officials who threatened magazine vendors with criminal prosecutions if they did not remove an edition of *Hustler* magazine from their newsstands. Noting that the threats created a *de facto* prior restraint, the court held the Mayor's unilateral actions unconstitutional as a suspension of the "public's fundamental right to due process of law, such as adequate notice and an opportunity to be heard on the question of obscenity." 586 F.Supp. at 424. The court further observed:

> Prima facie, the Pennsylvania obscenity statute provides the necessary procedural safeguards to ensure against the danger of a censorship system suppressing constitutionally protected speech. *See* 18 Pa.Cons.Stat. § 5903 (Purdon's 1973). The plaintiffs do not assail the constitutionality of the Commonwealth's obscenity statute; nor does this court address that question. It is enough to note that a valid state procedure for determining obscenity exists, but was not resorted to in this case. Herein lies the legal infirmity of the Mayor's actions.

*Id. See also Brown v. Pornography Comm'n of Lower Southampton, supra*, 620 F.Supp. at 1215 (Pennsylvania Obscenity Act and state Constitution require a jury determination of obscenity before prior restraint can be imposed); *Long v. 130 Market St. Gift & Novelty of Johnstown*, 294 Pa.Super. 383, 440 A.2d 517 (1982) (prior restraint requires adjudication of obscenity as to each book to be banned); *Brightbill v. Rigo, Inc.*, 274 Pa.Super. 315, 418 A.2d 424 (1980) (same). The absence of these essential procedures renders the ordinance inconsistent with the state act and unconstitutional on its face.

### III. CONCLUSION

The Newtown Township Obscenity Ordinance is unconstitutional, both on its face and as applied, in that it allows the Township Board of Supervisors to impose a prior restraint on free speech without providing for prompt judicial review in which a local court may apply contemporary community standards to make a final determination of obscenity. These requirements are clearly mandated by the Supreme Court's line of cases beginning with *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) and by the Pennsylvania State Obscenity Act, 18 Pa.Cons.Stat. § 5903(g). Plaintiff's motion for a declaratory judgment under 28 U.S.C. § 2201 is therefore granted and a conditional use permit shall be issued under 28 U.S.C. § 2202. In addition, the Board is hereby enjoined from application of the ordinance as written. Given this decision, the court elects not to address plaintiff's claims of overbreadth and vagueness as they apply to the substantive provisions of the ordinances. Such considerations are the province of the state courts under *Pullman* abstention. *See Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

Finally, due to the complexity of the issues the court exercises its discretion under 42 U.S.C. § 1988 to deny an award of attorney's fees. The court does not reach the issue of damages since no evidence has been submitted.

An appropriate Order will be entered.

---

enjoining such violation. The court shall issue an injunction only after written notice and hearing and only against the defendant to the action. The court shall hold a hearing within three days after demand by the attorney for the Commonwealth, one of which days must be a business day for the court, and a final decree shall be filed in the office of the prothonotary within 24 hours after the close of the hearing. A written memorandum supporting the decree shall be filed within five days of the filing of the decree. The attorney for the Commonwealth shall prove the elements of the violation beyond a reasonable doubt. The defendant shall have the right to trial by jury at the said hearing.

18 Pa.Cons.Stat. § 5903(g).